## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CHATAQUOA NICOLE MASON,                 )
7500 Connecticut Ave.                   )
Chevy Chase, MD 20815,                  )
                                        )        Civil Action No. 1:23-cv-02238
          Plaintiff,                    )
                                        )
     v.                                 )
                                        )
THE AMERICAN PROSPECT, INC.,            )
1225 I Street NW, Suite 600             )
Washington, DC 20005,                   )
                                        )
  - and -                               )
                                        )
JULIANNE MCSHANE,                       )
1625 Putnam Ave., Apt. 5G               )
Ridgewood, NY 11385,                    )
                                        )
          Defendants.                   )
_____)

## COMPLAINT

Plaintiff, Chataquoa Nicole Mason ("C. Nicole Mason" or "Dr. Mason"), by and through

undersigned counsel, submits this civil complaint pursuant to the Court's diversity jurisdiction,

28 U.S.C. § 1332, against Defendants, The American Prospect, Inc. (the "Prospect") and

Julianne McShane ("Ms. McShane").

## INTRODUCTION

1.      This is a civil action for defamation and tortious interference with business

relations arising from defamatory statements published by the Prospect and Ms. McShane

concerning Dr. Mason.  The statements, which are false and/or misleading, disparage

Dr. Mason's leadership as President/CEO of Institute for Women's Policy Research ("IWPR"),

which is a nonprofit thinktank located in Washington, DC.  The Prospect and Ms. McShane negligently, intentionally, and/or with reckless disregard of the truth published the defamatory statements in an article authored by Ms. McShane, reviewed and edited by the Prospect, and published by them on the Prospect's website.  *See* https://prospect.org/health/womens-policy-giant-struggles-amid-new-leadership/ (last visited Aug. 1, 2023).

2.     The article reads like a "hit piece" intended to cause Dr. Mason to be terminated from her position as President/CEO of IWPR.  The article was instigated by disgruntled former employees of IWPR, including Heidi Hartmann ("Dr. Hartmann") who was IWPR's prior President/CEO.  Dr. Hartmann had been terminated due to serious mismanagement and, upon information and belief, encouraged others to disparage Dr. Mason in an effort to regain influence and status within the organization and to exact revenge on Dr. Mason for accomplishing what she could not accomplish during her tenure as President/CEO and for terminating her long-time loyalists.

3.     Ms. McShane began working on the article as a freelancer and, upon information and belief, was hoping to make a name for herself as an investigative journalist by publishing the article and causing Dr. Mason to be terminated.  The Washington Post considered publishing the article but declined to do so because, upon information and belief, the article was deemed unsupported by the facts and/or otherwise did not meet accepted journalistic standards.

4.     The article was subsequently published by the Prospect, which is led by a many-years-long friend of Dr. Hartmann's.  The article does not disclose their friendship or Dr. Hartmann's friendships with others who are affiliated with the Prospect.  It also does not disclose that Ms. McShane had applied to work for an organization that Dr. Mason previously led and that her application was rejected.  Upon information and belief, the Prospect (through its

2

agents) and Ms. McShane conspired with Dr. Hartmann and others to publish the article and thereby cause Dr. Mason to be terminated and otherwise harmed.

5.     As a direct and proximate result of the defamatory statements, Dr. Mason's been seriously damaged: her professional reputation has been destroyed; she was terminated from her position as IWPR's President/CEO; she has been unable to find new employment as an executive leader; she has incurred and will incur significant expenses to repair her reputation; and she has suffered emotional injury due being publicly humiliated and having her stellar career shot to the ground through a coordinated effort to disparage her.

6.     Prior to the publication of the article, there was not any public controversy regarding Dr. Mason's leadership of IWPR.  She was well-regarded by the members of IWPR's Board of Directors, leaders of peer organizations, funders, and others.

## PARTIES

7.     C. Nicole Mason is an adult citizen of the State of Maryland who resides at 7500 Connecticut Avenue, Chevy Chase, Maryland, 20815.  Dr. Mason, who holds a Ph.D. in political science, has devoted her career to working in executive leadership positions of nonprofit organizations, and, most recently, served as President/CEO of IWPR, which describes itself as a "national think tank" that "build[s] evidence to shape policies that grow women's power and influence, close inequality gaps, and improve the economic well-being of families."

8.     The American Prospect, Inc. is a nonprofit corporation organized under the laws of the District of Columbia.  The Prospect maintains its headquarters in the District of Columbia at 1225 I Street, NW, Suite 600, Washington, DC 20005.  The Prospect is an online and print publisher of journalism.  Its website describes itself as "devoted to promoting informed discussion on public policy from a progressive perspective" and, in particular, "addressing the policy alternatives and the politics necessary to create good legislation."  The Prospect is the

3

publisher of the subject article, which does not "discuss[] . . . public policy" or "address[] the policy alternatives and the politics necessary to create good legislation."

9.      Julianne McShane is an adult citizen of the State of New York.  She resides at 1625 Putnam Avenue, Apt. 5G, Ridgewood, NY 11385.  She is employed by NBC News in New York, New York, to write short articles (blog posts) for its website.  She also works as a freelance journalist and, upon information and belief, aspires to be an investigative journalist.  Ms. McShane is the author of the subject article published by the Prospect about Dr. Mason.

## JURISDICTION AND VENUE

10.      The Court has personal jurisdiction over The American Prospect, Inc.  The Prospect is organized under the laws of, and maintains its headquarters in the District of Columbia.  The Prospect published the subject article in the District of Columbia, and some or all of its editorial processes leading to publication of the article occurred in the District of Columbia.

11.      The Court has personal jurisdiction over Julianne McShane.  Ms. McShane is the author of the subject article, which was published in the District of Columbia.  A substantial portion of Ms. McShane's purported investigation for the article involved communicating with people in the District of Columbia.  The article caused tortious injury in the District of Columbia; specifically, it damaged Dr. Mason's reputation in the District of Columbia and caused her to be terminated by her employer, IWPR, in the District of Columbia.

12.      The Court has diversity jurisdiction over this case because the amount in controversy exceeds $75,000.00 and the parties on each side of this case are all from different American states; specifically, Dr. Mason is a citizen of the State of Maryland whereas the Prospect is a citizen of the District of Columbia and Ms. McShane is a citizen of the State of New York.

4

13.     Venue is appropriate in this Court because the place of publication of the subject article is the District of Columbia; the article concerns IWPR which has its headquarters in the District of Columbia; the article underwent editorial processes and then publication in the District of Columbia; the article was directed toward an audience located in large part in the District of Columbia; and Dr. Mason's damages arise in large part from serious harm to her reputation in the District of Columbia which caused her to be terminated by her former employer, IWPR, in the District of Columbia.

## FACTUAL BACKGROUND

### Dr. Heidi Hartmann's Failed Leadership

14.     The genesis of the subject article begins with IWPR, as it existed prior to Dr. Mason's affiliation with it.

15.     IWPR's founding director and its President/CEO up until at or about the time Dr. Mason was hired, was Dr. Heidi Hartmann.

16.     Under Dr. Hartmann's leadership, in the years before IWPR hired Dr. Mason, IWPR suffered a toxic work environment, diminishing reputation, and fundraising shortfalls, as evidenced by the need to cut the pay of staff by nearly half.

17.     Under Dr. Hartmann's leadership, IWPR hired almost no minorities, and, as a result, its personnel was almost entirely White like Dr. Hartmann.

18.     IWPR conducted an internal investigation concerning Dr. Hartmann as a result of a whistleblower complaint made by a loyal employee, Executive Vice President Barbara Gault, who had worked for IWPR for more than two decades.

19.     As a result of the internal investigation, IWPR's Board of Directors ("Board") removed Dr. Hartmann from her position as President/CEO.  IWPR terminated Dr. Hartmann due to her abusing staff and otherwise creating a toxic work environment, engaging in racist

behavior, including hiring practices that resulted in the organization's personnel being almost entirely White, and failing to adequately fundraise.

**The Hiring of Dr. Mason**

20.    IWPR's Board began a search for a new President while in the process of terminating Dr. Hartmann.

21.    Dr. Mason was not involved in IWPR's termination of Dr. Hartmann and was not affiliated with IWPR until she was hired in October 2019.

22.    IWPR's objectives in searching for a new President/CEO included making the organization more diverse, making the organization less toxic, obtaining new grants and funding, and otherwise revitalizing the organization.

23.    Dr. Mason learned through a headhunter that IWPR was searching for a new President/CEO and decided to apply for the position.

24.    Dr. Mason is an African American woman who was immensely qualified for the position due to her extensive education, including a Ph.D. in political science, more than twenty years of research and advocacy experience focused on women's economic security, her long track record of success in leadership positions, and her stellar references.

25.    Dr. Mason accepted IWPR's offer of employment on October 4, 2019, and began working for IWPR a short time later.

**Dr. Mason's Achievements**

26.    Upon joining IWPR, Dr. Mason immediately began making managerial changes to the organization, which were necessary because the organization was in a state of total disarray and disrepair.  There were very few management systems and little management infrastructure in place.  IWPR did not have written policies (not even job descriptions) and instead had been operating at the whim of Dr. Hartmann.  Staff also complained of racism and

discrimination, and a toxic work environment.  With respect to finances and fundraising, IWPR had no general operating support funds and struggled to meet its annual fundraising goals. Dr. Mason's observations of the organizational culture and challenges faced by IWPR were documented in a memo to IWPR's Board on October 13, 2019.

27.     Dr. Mason's achievements as President/CEO were profound and almost immediate.  She worked tirelessly to achieve major goals for IWPR over the first 90 days of her employment, including dealing with the toxic work environment, establishing written policies, and setting high-performance expectations, including for herself.  She subsequently created and implemented new systems and infrastructure, including job descriptions for all employees, rewrote the employee handbook, restructured the research department, revised the budget and fundraising forecasting, worked to develop a salary and compensation scheme to ensure salary equity and transparency, and re-branded the organization.  She also significantly raised the profile of the organization, raising more than $25 million in support, attracting new major donors and supporters, and conceptualizing and spearheading two major conferences: The Childcare Conference held in partnership with American University in Washington, DC and the Power + Summit in San Francisco, California.  During Dr. Mason's tenure, she won the New Executives Fund Award from Open Society Foundations and was named one of the World's Greatest Leaders by Fortune Magazine.

28.     In December 2019, shortly after joining IWPR, Dr. Mason discovered a $1 million budget deficit.  She immediately notified IWPR's Board, which was previously unaware of the shortfall.  Before departing, Dr. Hartmann presented a budget to the Board with revenue projections from dummy sources or donors whom she knew would not give at the level indicated in the budget.  Dr. Mason revised the budget and was forced to delay critical staff hires

as a result of the shortfall.  Dr. Mason also worked expeditiously to close the shortfall by February 2020, which she did by obtaining new grants and other fundraising.

29.     After eliminating the budget deficit, Dr. Mason succeeded in raising many millions of dollars to support the work and research of IWPR, thus fundamentally turning around IWPR's finances, creating a significant operating surplus, and enabling the organization to expand and strengthen its activities.

30.     Dr. Mason also worked to improve workplace diversity by recruiting and hiring diverse candidates.  She also hired a human resources firm, HRi, to help manage the human capital needs of the organization.  As a result of those efforts, IWPR hired many minorities and is now much more diverse than it was under the leadership of Dr. Hartmann.

31.     Dr. Mason also substantially raised IWPR's public profile by taking steps to participate in public forums and networking events and by ensuring that IWPR's research work flourished and was aligned with being impactful.

**Dr. Hartmann's Efforts to Undermine Dr. Mason's Leadership**

32.     Dr. Mason achieved great successes for IWPR, notwithstanding that from the outset of her employment, Dr. Hartmann and employees loyal to Dr. Hartmann undermined her.

33.     Although Dr. Hartmann's employment with IWPR was terminated on August 31, 2019, she sought to maintain her power and influence.  Under the terms of her severance agreement, the organization allowed Dr. Hartmann to manage its biggest research grant and a research team comprised of IWPR's most senior researchers, including Jeff Hayes and Chandra Childers ("Dr. Childers").  Dr. Hartmann and the researchers refused to recognize the leadership of Dr. Mason, notwithstanding that Dr. Mason was the President/CEO.

34.     Dr. Hartmann attempted to undermine Dr. Mason's authority and sabotage her leadership and management.  Even before Dr. Mason's first day of work, Dr. Hartmann

8

eavesdropped using a conference line speaker phone in IWPR's conference room, during a meeting in which Dr. Mason introduced herself to IWPR's staff.  She persuaded an employee to call her and put her on speakerphone in the conference room.  Dr. Mason was notified by other staff immediately after the meeting.  Dr. Hartmann admitted having listened in when she subsequently met with Dr. Mason the week of October 12, 2019.

35.     On Dr. Mason's first day of work, Dr. Hartmann requested a meeting with IWPR's research staff, thus making it clear that she intended to remain in authority, notwithstanding the change of leadership.  Dr. Hartmann also demanded to have in-person meetings at IWPR's offices.

36.     As a result of these behaviors and demands, as well as concerns raised by IWPR staff about Dr. Hartmann being abusive, Dr. Mason decided to ban her from IWPR's offices. Dr. Hartmann responded by snidely saying to Dr. Mason, "I thought we were going to be friends."

37.     It is documented and well-known that Dr. Hartmann opposed anyone other than her leading IWPR.  Dr. Mason just happened to be her appointed successor, so she was opposed to Dr. Mason.

38.     Immediately following Dr. Mason's hire, Dr. Hartmann repeatedly complained to multiple influential field leaders about Dr. Mason, alleging that she did not believe Dr. Mason could do the job.  She also told a former Chair of IWPR's Board, Loretta Ross, that she did not believe Dr. Mason could close the $1 million funding deficit that she left at the organization.

39.     During Dr. Mason's tenure, Dr. Hartmann continued undermining her leadership and contacting IWPR staff, even after her contract was terminated, specifically Jeff Hayes and Ryan Koch.  On more than one occasion, Dr. Mason contacted Dr. Hartmann and asked her not

to disparage IWPR or her leadership.  In one e-mail exchange, Dr. Hartmann admitted that she actively tried to undermine Dr. Mason's leadership with negative remarks and comments to esteemed colleagues and peers.

40.     Dr. Hartmann remained under contract for a year and a half after being terminated from her position as President/CEO, and throughout that time, caused significant management challenges for Dr. Mason.  When the contract expired, Dr. Mason refused to renew it, thus bringing a final end to Dr. Hartmann's work for IWPR.

41.     Upon information and belief, Dr. Hartmann was embittered and vengeful because she had been forced out of an organization she founded and led for many years, and she chose to direct her ire at Dr. Mason.

42.     However, Dr. Hartmann was not the only person who had an axe to grind. Dr. Mason terminated three other individuals closely associated with Dr. Hartmann; specifically, she terminated Chandra Childers in October 2021, Jeff Hayes in February 2022, and Ariane Hegewisch in November 2022.  Despite different end dates, all three employees were informed of their termination on the same day.  Although terminated from her position, Ariane Hegewisch was allowed to remain as a senior research fellow at IWPR.  The reorganization of the research department and alignment of roles was a major point of contention for these long-term IWPR senior researchers and others.  Many of them were unaccustomed to accountability, timelines, or full ownership of research products and outcomes.  They believed Dr. Mason's leadership was a threat to their positions and status within the organization and undermined Dr. Mason accordingly.  Other close associates of Dr. Hartmann left of their own volition.

43.     Following Dr. Mason's departure from IWPR in January 2023, Dr. Hartmann sent a letter to IWPR's Board signed by her colleagues applauding the decision to part ways with

Dr. Mason and asking them to allow her to chair the search for the next President/CEO.  She was not allowed to chair the search committee.

### Racism at IWPR Directed Against Dr. Mason

44.     In the first week of Dr. Mason's employment at IWPR, she reported and documented racial discrimination and bias at the organization.  Furthermore, as her tenure at the organization progressed, Dr. Mason complained to IWPR's Board about racism in early 2021.  Dr. Mason complained because, despite the success of the organization and its tremendous growth, some employees refused to follow her leadership.  They also sabotaged and undermined her leadership with new and incoming employees.  IWPR's Chief Operating Officer, Cynthia Hess, agreed that race played a critical role in how Dr. Mason was treated.  Upon information and belief, Dr. Hartmann took advantage of these divisions to undermine Dr. Mason.

### The Washington Post Rejects Ms. McShane's Article

45.     Ms. McShane began her purported investigation of Dr. Mason's leadership of IWPR at or about the time long-term, and senior IWPR employees Chandra Childers, Jeff Hayes, and Ariane Hegewisch were terminated.  All were loyalists of Dr. Hartmann and actively undermined the leadership of Dr. Mason, refusing to accept the organizational changes and directives issued by IWPR's leadership.

46.     Based on this timing, Dr. Hartmann's long history of making disparaging comments about Dr. Mason, Dr. Hartmann's desire to return to some position of influence or status at IWPR, Dr. Hartmann's strong desire to cause Dr. Mason to fail, the fact that Ms. McShane would not have known anything about IWPR's internal affairs unless someone reached out to her, and the flattering portrayal of Dr. Hartmann in the subject article including gratuitously referring to her as a "genius," it is clear that Dr. Hartmann instigated the investigation and enlisted other disgruntled former employees to support her.

47.     Dr. Hartmann relied on the assistance of insiders, including long-time IWPR employee Ryan Koch, Senior Director of Grants and Contracts, who, upon information and belief, secretly and without permission provided Ms. McShane with IWPR's internal documents. He was one of just three people, including Dr. Mason and the newly hired Senior Director of Finance, who had unfettered access to and managed these documents.

48.     Dr. Mason soon found out about the investigation and plans for the article, which Ms. McShane initially pitched to The Washington Post, claiming in written e-mails and texts to potential sources, funders, and colleagues of Dr. Mason that it would be published there. Dr. Mason became aware of the article because Dr. Childers, after being let go from IWPR, went on to work at another peer organization, and the President of that organization overheard Dr. Childers gossiping about wanting to harm Dr. Mason through the publication of an article in The Washington Post.  The President, alarmed by what she heard, alerted Dr. Mason to what was transpiring.

49.     Dr. Mason then reached out to The Washington Post, pointing out that no one had reached out to her about the article and that she had not been allowed to provide her or IWPR's perspective.  Within just one hour of that conversation, Ms. McShane reached out to her sources, including Dr. Childers and Leah Thomas.  Dr. Mason subsequently contacted Ms. McShane and The Washington Post's assigned editor to let them know that she was aware that Ms. McShane had contacted the sources to let them know Dr. Mason had contacted The Washington Post.  She also let Ms. McShane and the editor know that she believed it to be improper and unethical to do so and that it was inconsistent with independent journalism.

50.     Dr. Mason then had extensive back-and-forth communications with the editors of The Washington Post who were handling the article.  Initially, she communicated with Lena

Felton, who subsequently left The Washington Post to pursue other opportunities.  The article

was then reassigned to a new editor, Renae Merle.

51.    During these extensive back-and-forth communications, Dr. Mason and IWPR's

Board provided detailed information to The Washington Post and Ms. McShane to corroborate

Dr. Mason's viewpoint and otherwise to establish that the planned article was false and

misleading.

52.    After receiving the extensive information, including relevant background

information and statements from Dr. Mason and IWPR's Board, providing information

responsive to all of the questions posed by Ms. McShane, The Washington Post declined to

publish the article, presumably because the article was deemed unsupported by the facts and/or

otherwise did not meet accepted journalistic standards.

### The Prospect Publishes the Article

53.    Dr. Mason subsequently learned that the Prospect was considering publishing the

article.

54.    Ms. McShane and David Dayen ("Mr. Dayen"), Executive Director of the

Prospect, contacted Dr. Mason by e-mail for comment.  In the e-mail, Ms. McShane said

The Washington Post and her current employer, NBC News, were aware the Prospect was

publishing the article and were okay with it.

55.    Dr. Mason responded by sending to Ms. McShane and Mr. Dayen the same

package of information that she had sent to The Washington Post to ensure that Mr. Dayen had

the same information.  Additionally, to ensure that Mr. Dayen was aware, Dr. Mason

communicated that The Washington Post had rejected Ms. McShane's article.  Mr. Dayen

disregarded the information that Dr. Mason provided and disregarded that the article had been

rejected by The Washington Post.

56.     The Prospect published the article concerning Dr. Mason on November 29, 2022.

57.     The Prospect's decision to publish the article was highly unusual.

58.     The Prospect publishes policy articles; it does not have a history of publishing gossipy stories or articles about alleged internal personnel problems of organizations.

59.     The Prospect describes itself as follows on its website: "The American Prospect is devoted to promoting informed discussion on public policy from a progressive perspective.  In print and online, the Prospect brings a narrative, journalistic approach to complex issues, addressing the policy alternatives and the politics necessary to create good legislation.  We help to dispel myths, challenge conventional wisdom, and expand the dialogue."

60.     The Prospect's publication of the article was inconsistent with its self-proclaimed mission because the article does not "discuss[] . . . public policy" or "address[] the policy alternatives and the politics necessary to create good legislation."

61.     The Prospect published the article on its website but did not publish it in its print magazine, notwithstanding that the article purports that it was the product of a months-long, extensive investigation by the Prospect.  The Prospect apparently concluded that the article was not fit for print.

62.     The article was also highly unusual because it was clearly intended to cause harm to Dr. Mason, up to and including causing her termination.

63.     It was also highly unusual because it gratuitously referred to Dr. Hartmann as a "genius" and made no reference to the fact that she had been terminated as IWPR's President/CEO, let alone that she had been terminated due to causing a toxic work environment, declining fundraising, and other mismanagement.

64.     Dr. Hartmann has had a many-years-long friendship with Robert Kuttner, Co-Founder and Co-Editor of The Prospect, and friendships with others affiliated with the Prospect.

65.     The article does not disclose the close personal relationship between Mr. Kuttner and Dr. Hartmann or others affiliated with the Prospect.

66.     The article also does not disclose that Ms. McShane had previously applied to work for an organization Dr. Mason led before being hired by IWPR and that her application was rejected.

**False and Defamatory Statements**

67.     The Prospect and Ms. McShane negligently, intentionally, and/or with reckless disregard of the truth published numerous false and defamatory statements about Dr. Mason that harmed her professional reputation, caused her to lose her position as President/CEO of IWPR, and diminished her future employment opportunities as well as causing other injuries.

68.     The article repeatedly falsely states that Dr. Mason did not respond to questions. However, Dr. Mason and IWPR's Board answered Ms. McShane's questions and provided supporting documents and statements that directly contradict the statements made in the article. Additionally, IWPR's funders, including the Kresge Foundation, the Ms. Foundation for Women, and the Hewlett Foundation, all contacted by Ms. McShane, provided information to her that contradicted Ms. McShane's reporting.  Ms. McShane disregarded the information.

69.     The article states that "Mason did not respond to a question from the Prospect about what she believes has caused the turnover" of employees and that "Mason did not respond to a specific inquiry about why Childers was fired."  However, Dr. Mason provided Ms. McShane with information and a response to the turnover rate, and a statement regarding the termination of Dr. Childers' employment and chose not to include it in the article.  Specifically,

on October 4, 2022, Ms. McShane received a document with answers to her questions and

statements from IWPR that included the following:

> Upon Dr. Mason's hiring and at the direction of the Board of
> Directors, IWPR embarked on a reorganization plan that
> significantly changed titles and staffing arrangements.  Many
> research positions are based on the new organizational structure
> approved by the Board.  It takes time to fill high-level research
> positions, and we are committed to finding the right individuals for
> every role who can fulfill the organization's mission.  Change
> management and a leadership transition after the departure of a
> Founding Director can be challenging.  Oftentimes, legacy staff
> have some resistance to the new direction of the organization,
> structural changes, and new systems of accountability.  That is no
> different at IWPR – but Dr. Mason and the Board are committed to
> the work Dr. Mason has started, which is intended to strengthen
> the organization's standing in the academic community and ensure
> its relevance for years to come.  While there has been attrition at
> IWPR, there are a myriad of reasons why staff left the
> organization, both personal and professional.  During intense
> leadership transitions, staff departures are common and to be
> expected.  It also bears noting that some employees have been
> terminated for failing to meet expectations, as is the case in any
> organization that strives for excellence in its field.  We cannot
> comment on specific personnel matters, but IWPR does have
> robust procedures in place to ensure that employees are given an
> opportunity to improve their performance before any employment
> action is taken.  IWPR also allocates funds annually to professional
> development for all staff.

70.     The article states that "[t]he organization's turnover rate was 80 percent last year

[i.e., 2021] and is 72 percent [UPDATE: 78 percent] [i.e., 2022] so far this year, according to the

Prospect's analysis of staff departures."  These statements are false.  The highest attrition rate for

any year during Dr. Mason's time as IWPR's President/CEO was 44 percent, and for all other

years, it was substantially less.  Furthermore, Dr. Mason told Ms. McShane on two separate

occasions by e-mail that Ms. McShane's calculations were incorrect and that IWPR's leadership

could not verify Ms. McShane's calculations.  Additionally, the actual turnover rate at IWPR

was consistent with non-profit leadership transitions and the change experienced by

organizations during and shortly after the COVID-19 Pandemic. Inexplicably, the article does not mention the possible impact of the COVID-19 Pandemic on turnover.

71.    In attempting to build a narrative against Dr. Mason and to bolster the credibility of one of her detractors, the article states that Dr. Mason was Michelle Cueller Hawks's "direct supervisor." This is false. Ms. Cueller Hawks was supervised at all relevant times by Lindsey Reichlin Cruse, Managing Director of the Student Parent Success Initiative at IWPR. Dr. Mason had very limited contact with Ms. Cueller Hawks and interacted with her mainly in group settings or with others present.

72.    The article states that Dan Snyder, owner of the Washington Commanders football team, gave IWPR a grant. This is false. IWPR was contacted by Roc Nation, a philanthropic intermediary, on behalf of an anonymous donor. The anonymous donor was Tonya Snyder, the wife of Dan Snyder. The donation came without conditions, strings, or obligations to Ms. Snyder or the Washington Commanders. The gift was not mentioned or publicized in the media by the Commanders Football team and was not known publicly.

73.    To bolster the narrative against Dr. Mason, the article states that Dr. Mason "fired Childers" (i.e., Dr. Childers). However, Dr. Mason did not unilaterally terminate Dr. Childers' employment. The decision to terminate her was made collectively by IWPR's leadership, which included not only Dr. Mason but also IWPR's Chief Operating Officer, and was executed by its Associate Director of Human Capital. During her termination meeting, Dr. Childers remarked that she thought she "would have been fired a long time ago," apparently because she understood that she was underperforming.

74.    The article states that Dr. Mason was responsible for causing IWPR to have "a toxic work environment." This statement is false. IWPR had a toxic work environment well

before Dr. Mason joined the organization due to Dr. Hartmann's failed leadership.  The toxic

work environment was identified by IWPR's Board during an internal investigation focused on

Dr. Hartmann and was further documented in a memo to the Board by Dr. Mason during her first

week of employment at IWPR.  Dr. Mason was therefore tasked with addressing that problem

when she was hired as President/CEO.  Inexplicably, the article says nothing whatsoever

disparaging about Dr. Hartmann and instead gratuitously refers to her as a "genius."

75.    Additionally, internal staff survey results – which Dr. Mason provided to

Ms. McShane – clearly showed that IWPR's work environment was not toxic.  Specifically, on

October 4, 2022, Dr. Mason sent the following statement to Ms. McShane:

> **Organizational Culture**
>
> Giving our employees opportunities to grow and fostering an
> inclusive, energized and motivated workplace are top priorities for
> us.  Dr. Mason is critical to that effort, and has worked hard to
> create a culture at IWPR that is both inclusive and encouraging of
> feedback.
>
> That work is already bearing fruit. In the most recent staff survey
> (June 2022), respondents felt positive about the direction,
> interactions and leadership of IWPR:
>
> • Nearly 80 percent of staff surveyed felt valued as a member of
> the team and the same percentage indicated that the work they are
> doing at IWPR is meaningful and impactful.
>
> • 57 percent surveyed said there is a spirit of cooperation and
> support at IWPR, and Most (63%) agree that the working
> environment at the organization facilitates their best work.
>
> • Nearly 88 percent of staff have confidence in the direction of
> IWPR.
>
> • IWPR leadership: Nearly all the respondents on the most recent
> IWPR survey felt positively about IWPR leadership.  Specifically,
> 80 percent said the leadership of IWPR follows up on the
> ideas/opinions that employees contribute.

• When asked about the relationship between current leadership and staff, responses were generally positive.  About 63 percent felt that the leadership at IWPR cared about employees' well-being. 25 percent neither agree nor disagree.

A similar staff survey conducted in fall 2020, yielded similar results. A majority of staff indicated staff morale was either moderate or high. Six out of 22 staff surveyed said they feel it is still low.  The pandemic made it more difficult to stay connected and rebuild the organization's culture, likely playing a role in this dynamic.  IWPR leadership was excluded from the survey.

76.     The Prospect and Ms. McShane disregarded this information and, in so doing, falsely portrayed Dr. Mason as creating a toxic work environment, notwithstanding that she was not responsible for creating a toxic work environment and had largely addressed the issue through her leadership.

77.     The article states that "[r]esearch was not produced or performed."  This statement is false.  Under Dr. Mason's leadership, IWPR produced 90 research reports, many of which she authored or co-authored.  During the COVID-19 Pandemic, IWPR's research focus shifted to research providing analysis of the impact of the COVID-19 Pandemic on the economic well-being of women and families.  IWPR's funders agreed to this shift in focus, thus resulting in deliverables being altered or substituted.  This shift was very important because it allowed IWPR to fill a vital knowledge vacuum at the time.  IWPR's funders told Ms. McShane about these changes in focus in response to her inquiries, but she disregarded this important information.

78.     The article states that Dr. Mason screamed or yelled at staff.  This is false.  Dr. Mason never screamed or yelled at staff, including Michelle Cueller Hawks.  The article points to an e-mail message provided by Ms. Cueller Hawks as proof.  However, the e-mail message does not mention screaming or yelling or otherwise corroborate the allegation.

79.     The article points to purported anecdotes published on Glassdoor.com, a website where information is shared about employers.  However, all of the anecdotes are from

anonymous sources that the Prospect and Ms. McShane could not identify and whose accounts could not be verified.  There were, therefore, no reasonable grounds for any journalist to rely on them or to republish them through a hyperlink.

80.     Furthermore, during her tenure as President/CEO, Dr. Mason only supervised 5-6 IWPR employees, and IWPR's Board has never alleged that Dr. Mason screamed or yelled at IWPR's staff, and none of Dr. Mason's independent management evaluations from staff have indicated she yelled or screamed at anyone.  In fact, management survey results for Dr. Mason from 2021 state the following regarding her leadership:

- o   consistently gives constructive feedback that helps improve her supervisee's work;
- o   consistently and clearly communicates expectations;
- o   regularly provides the information they need to do their job effectively;
- o   responds constructively when they make a mistake;
- o   is responsive to their ideas and feedback;
- o   supervisee's feel somewhat comfortable giving Nicole feedback;
- o   handles conflict professionally;
- o   creates a trusting environment;
- o   regularly acknowledges their successes;
- o   regularly provides constructive feedback that makes them feel empowered;
- o   strongly cares about them as a person;
- o   direct reports feel very confident in Nicole's ability to help them succeed and;
- o   Nicole is invested in their development.

81.     Additionally, long-time employee Ariane Hegewisch, following the publication of the article, was asked by a new IWPR senior researcher about the truth of allegations of yelling and screaming at employees reported in the article.  She told the senior researcher they were not true.

82.     Next, it was common knowledge that the Glassdoor.com account for IWPR, which listed the name incorrectly as "IWP_Rsch" was used by disgruntled IWPR legacy employees who were aware of the existence of the account and used it to disparage the new direction and leadership of the organization.  Dr. Mason first became aware of the Glassdoor.com account when Dr. Hartmann sent the new Associate Director of Human Capital at IWPR an e-mail in 2021, stating that "we might want to take a look at it."  Leading up to the publication of the article and over the course of the investigation, the comments regarding Dr. Mason, her leadership, and the organization became more inflammatory and in support of Ms. McShane's narrative.

83.     The article states that "records of board meetings show Mason . . . admitted" that "high turnover has undermined the organization's capacity to conduct research it once pioneered."  This statement is false.  Dr. Mason has never admitted or otherwise said that high turnover had undermined the organization's capacity to conduct research.

84.     The article states that, according to a written summary of a Board meeting, board member Joan Marsh, chief regulatory and state external affairs officer at AT&T, asked "if the staffing challenges undermines [sic] the commitments made to our funders."  This statement is false.  In a written statement to Ms. McShane, Ms. Marsh stated: "I cannot speak specifically to the quote you mention as it is not clear what specific documents you reference.  However, I disagree with your characterization and implications of both this purported quote and the current

state of IWPR.  Since her appointment in late 2019, Dr. Mason has had an open, frequent, and productive dialogue with the Board about her progress as well as the challenges in implementing the evolution of the organization's strategy."

85.    The article states, "[r]epresentatives for the Kresge Foundation, the Children's Defense Fund, and the Women's Foundation of Florida declined requests for comment on the IWPR projects they funded."  However, the following funders responded to Ms. McShane's inquiry: Ms. Foundation for Women (3-4 times by e-mail), Kresge Foundation (2-3 times by e-mail), and Hewlett Foundation (3-4 times by e-mail).  Additionally, the Managing Director for Fondation CHANEL reached out to Ms. McShane to be interviewed after Ms. McShane had previously reached out to her.  Ms. McShane declined to speak with the Managing Director stating she had finished reporting on the story.  The funders responded, informing Ms. McShane that IWPR had met all its agreements and obligations, including producing reports. Ms. McShane responded by harassing IWPR funders who did not provide her with information supporting her efforts to disparage Dr. Mason.

86.    A representative from the Ms. Foundation replied to Ms. McShane on September 27, 2022, stating, "IWPR was contracted to conduct research and landscape analysis for internal use for our Girls of Color Initiative, and that work was completed…. [we] would [also] like to correct on background that the study was not a grant, but part of a consulting contract and it was completed in accordance to the contract."  Ms. McShane and the Prospect omitted from the article responses from funders, who provided information that contradicted the narrative they wanted to state to paint Dr. Mason in a bad light.

87.    The article states that a "representative added that the [NoVo] foundation is no longer funding IWPR, but did not elaborate as to why."  This statement is highly misleading.

22

The NoVo Foundation ceased funding work focused on women and girls in May 2020.  In late 2020, IWPR received a one-year, small tie-off grant.  No women's organization received a grant from the NoVo Foundation after 2020.  *See* https://www.philanthropy.com/article/NoVo-Fund-Led-by-a-Buffett/248807 (last visited Aug. 1, 2023).  This information was readily and publicly available to Ms. McShane.

88.     The article also states the following with respect to funders:

> Those include a $400,000 project meant to focus on the wealth gap and women of color, funded by the Kresge Foundation and originally due in August 2021; a report on the status of Black women in three Southern states, funded by the Children's Defense Fund for $35,000 and originally due last December; a report on the status of reproductive rights in Florida—where a 15-week abortion ban is currently in effect—funded by the Women's Foundation of Florida and due last November; and research on Black mothers in for-profit schools and older Black women and unemployment, which was funded by a grant from the NoVo Foundation and completed by Childers—the former study director whom Mason fired—by June 2020, according to Childers and another former staffer familiar with the project.

89.     This is false. The Kresge Foundation grant in the amount of $400,000 was not meant to focus exclusively on the wealth gap and women of color.  It was a general operating support grant focused on economic security and women of color.  The scope, focus, and deliverables of the grant were altered due to the COVID-19 Pandemic and fulfilled.  Upon completion of the aforementioned grant, IWPR was awarded a new grant by The Kresge Foundation.  Ms. McShane was told this by The Kresge Foundation but disregarded it.

90.     Furthermore, all of IWPR's obligations to produce reports and other deliverables were satisfied, or the scope of the obligations was altered by the funding source, such as to take into consideration new research needs due to the COVID-19 Pandemic.  And it was Dr. Childers who was responsible for producing reports focused on Black women in the Southern States, older Black women and unemployment, and the NoVo-related products/projects.

23

91.     The article states that "SPSI launched in 2010 with $1 million from the Bill & Melinda Gates Foundation with the goal of studying inequities that student-parents, most of whom are women and students of color, face in higher education.  It has remained unstaffed since its last staffer, a research associate, left in February."  This statement is false.  When the Prospect and Ms. McShane published the article, two women of color had already been hired in the SPSI research area: Afet Dundar and Jennifer Turner.  This information was provided to Ms. McShane prior to publication.

92.     The article states that IWPR's "Student Parent Policy Working Group has seemingly disbanded."  This statement is false.  The working group existed at the time of the publication of the article and remains in existence.  Ms. McShane knew that the group had not been disbanded because Dr. Mason had told her that two people had been hired in that research area.

93.     The article states that "IWPR's annual budget reached $12 million in projected revenue this year, compared to about $4.5 million in projected revenue around the time Mason started, according to written records from board meetings."  This statement grossly overstates the amount of revenue that the organization had when Dr. Mason joined IWPR in 2019.  When Dr. Mason joined the organization, its budget was approximately $3.7 million.  In December 2020, Dr. Mason discovered a $1 million revenue deficit.  Under Dr. Mason's leadership, IWPR quickly closed that deficit and is now operating from a stronger financial position than at any time in the organization's history.  IWPR's Fiscal Year 2023 budget is $10,367,429, representing a 26 percent increase over the previous fiscal Year.  It is important to note that much of IWPR's growth under Dr. Mason's leadership occurred during a global pandemic and deep shifts in the labor market.

94.     The article states that "[r]ecords of board meetings show that at least four current and one former board member have raised concerns about staffing and turnover and offered to intervene." This statement is false. IWPR's Board members did not raise concerns about staffing and turnover. There was a Board-level discussion about staffing and hiring and how to accelerate hiring at IWPR.

## Aftermath of Publication

95.     The initial publication of the article did not have the intended effect or impact that Ms. McShane and the Prospect had hoped. It did not go viral and was mostly ignored.

96.     Ms. McShane then sought to promote the article by reaching out to Dr. Mason's peers at other nonprofit organizations (including executives of other women's organizations) to let them know about the article and to encourage them to distribute it.

97.     In promoting the article, Ms. McShane was not engaged in news gathering or other journalistic conduct. She was reaching out to promote the article and thus promote herself and bring about the article's intended effect, which, upon information and belief, was to bring about IWPR's termination of Dr. Mason and to otherwise cause harm to Dr. Mason.

98.     Peers at other non-profit organizations reached out to Dr. Mason to alert her to Ms. McShane's efforts to promote the article by contacting them.

99.     Ms. McShane also promoted the article on her Twitter account, pinning it like a trophy to her profile. She also encouraged individuals quoted in the article to share it on their profiles with defamatory statements about Dr. Mason and tag her in the posts. Following publication of the article, agents of the Prospect and those quoted or sourced anonymously in the article contacted IWPR's Board, funders, and other key stakeholders to disparage Dr. Mason.

100.    On the day the article was released, Dr. Hartmann issued a public statement regarding the article, applauding Ms. McShane's efforts. She also shared the article widely with

mutual high-level colleagues of Dr. Mason and others.  Dr. Hartmann clearly had prior notice of when the article would be published and how it would portray Dr. Mason.

101.    The article and Ms. McShane's campaign to defame and harm Dr. Mason were initially ignored by IWPR's Board.  However, Dr. Mason was terminated at the end of January 2023 due to the controversy (which did not exist prior to the publication) and given the title of "President Emerita."

102.    The article had a serious adverse impact on Dr. Mason's ability to lead IWPR internally and her relationship with IWPR's Board.  Immediately following the publication of the article, which was on "Giving Tuesday," IWPR's most significant fundraising day of the year, current IWPR staff questioned Dr. Mason's leadership and ability to lead the organization in the future due to the controversy.

103.    In parting ways, IWPR publicly stated that it was "deeply grateful for Dr. Mason's vision, research acumen, and for helping to take IWPR to the next level of impact and influence."

104.    Some members of IWPR's Board resigned in protest of the decision to part ways with Dr. Mason.

105.    Following Dr. Mason's departure from IWPR in January 2023, Dr. Hartmann sent a letter to IWPR's Board signed by her colleagues applauding the decision to part ways with Dr. Mason and asking them to allow her to chair the search for the next President/CEO.  She was not allowed to chair the search.

106.    On January 27, 2023, the Prospect published on its website (but not in print) a follow-on article by Ms. McShane declaring that Dr. Mason had been terminated as a result of

the Prospect's investigation. *See* https://prospect.org/health/2023-01-27-c-nicole-mason-womens-policy-research/ (last visited Aug. 2, 2023).

107.    At or about this same time, Ms. McShane boasted on social media that her investigation had resulted in Dr. Mason being terminated.

108.    Ms. McShane still boasts and brags on her LinkedIn public profile page that "[a] months-long investigation I reported for the American Prospect in November 2022 led to an internal investigation and a leadership change at a major U.S. think tank in early 2023."

109.    As a direct and proximate result of the preceding events, Dr. Mason has been severely harmed.

110.    Dr. Mason has been unable to find new employment.

111.    Headhunters have advised Dr. Mason that she currently is not employable as an executive because of the defamatory statements published by the Prospect and Ms. McShane.

112.    Dr. Mason has lost career opportunities, including current and future employment opportunities, and, as a consequence, future income. The entire trajectory of her career has been fundamentally changed for the worse.

113.    Dr. Mason has had to incur and will need to incur significant expenses to repair her reputation so she can return to working as an executive leader, including expenses for public relations consultants and executive leadership coaching.

114.    Dr. Mason has also suffered severe emotional distress as a direct and proximate result of the defamatory statements published by the Prospect and Ms. McShane, including feelings of humiliation and despair that have adversely affected her mental health and daily life and necessitated counseling and therapy resulting in additional expenses.

**COUNT I**
**Defamation**

115.    Paragraphs 1 through 114 above are incorporated by reference here.

116.    On November 29, 2022, the Prospect and Ms. McShane published on the Prospect's website an article titled "A Women's Policy Giant Struggles Amid New Leadership." The article was authored by Ms. McShane.

117.    Prior to the publication of the article, there was not any public controversy regarding Dr. Mason's leadership of IWPR.  She was well-regarded by the members of IWPR's Board of Directors, leaders of peer organizations, funders, and others.

118.    The article is publicly available to anyone who has access to the Internet and appears at or near the top of the search results for "C. Nicole Mason" in both Google and Bing.

119.    Ms. McShane is the author of the article and, as such, was responsible for its content.

120.    The article states that it was a product of an investigation by the Prospect.

121.    The Prospect assumed responsibility for the article's content by publishing the article on its website and adopting the article as its own.

122.    The article contains numerous false and defamatory statements about Dr. Mason, including but not limited to the following:

    a.    The article falsely states that Dr. Mason did not respond to questions while insinuating that the alleged failure to respond supported the article's narrative that Dr. Mason's management and leadership of IWPR was seriously flawed;

    b.    The article falsely states that IWPR's turnover rate was much higher than it actually was while attributing the alleged high turnover rate to alleged problems with Dr. Mason's management and leadership of IWPR;

28

c.  The article falsely states that Dr. Mason "admitted" that the alleged high turnover had undermined IWPR's research capacity;

d.  The article falsely states that Dr. Mason engaged in yelling and screaming at employees;

e.  The article falsely describes Dr. Mason's relationships with certain IWPR personnel so as to bolster and support false and defamatory statements made by personnel about Dr. Mason, including falsely describing Dr. Mason as Ms. Cueller Hawks's "direct supervisor" and suggesting that Dr. Mason was solely responsible for the decision to terminate Dr. Childers;

f.  The article falsely states that under Dr. Mason's leadership IWPR was failing to fulfill its obligations to produce reports and other deliverables;

g.  The article falsely insinuates that IWPR had lost funding from a foundation (NoVo) due to failure to provide deliverables;

h.  The article falsely states that one of IWPR's research areas (SPSI) did not have research staff and had been abandoned.

123.  The Prospect (through its agents) and Ms. McShane made the false and defamatory statements negligently, intentionally, and/or with reckless disregard of the truth as may be inferred from the circumstances, including but not limited to the following:

a.  Dr. Mason, IWPR, and funders provided to the Prospect and Ms. McShane detailed information refuting key allegations (such as those relating to turnover, work environment, and fulfillment of research obligations) but the Prospect and Ms. McShane disregarded the information;

29

b.   Ms. McShane had access to sources of information that contradicted her
reporting;

c.   The article reads like a "hit piece," thus evincing an intention to cause harm to
Dr. Mason;

d.   The Washington Post refused to publish the article, presumably because the
article was deemed unsupported by the facts and/or otherwise did not meet
accepted journalistic standards;

e.   The Prospect's publication of the article was highly unusual because the article's
nature differed substantially from the Prospect's stated purpose and other
published journalism;

f.   Dr. Hartmann, who wanted to regain influence at IWPR and made no secret of her
disliking of Dr. Mason, has had a many-years-long friendship with Robert
Kuttner, Co-Founder and Co-Editor of the Prospect, and friendships with others
affiliated with the Prospect, and, upon information and belief, used those
relationships to get the article published;

g.   The article does not disclose Dr. Hartmann's many-years-long friendship with
Mr. Kuttner and friendships with others affiliated with the Prospect;

h.   The article does not disclose that IWPR terminated Dr. Hartmann for creating a
toxic work environment and other failings and instead gratuitously refers to her as
a "genius";

i.   The article does not disclose that Ms. McShane had previously applied to work
for an organization that Dr. Mason led before being hired by IWPR and that the
organization rejected the application;

j.  The article emphasizes research work relating to minorities and statements made by a minority, so as to conceal that the article was the product of a mostly White cast of instigators, including Dr. Hartmann, Ms. McShane, and Mr. Kuttner, who conspired together to take down Dr. Mason, who is African American;

k.  The article links to false and defamatory statements about Dr. Mason which were posted on Glassdoor.com notwithstanding that the statements were posted anonymously and thus could not be verified;

l.  The article smears Dr. Mason by referencing a donation made by the wife of the owner of the Washington Commanders, notwithstanding that the donation had nothing to do with any of the management issues that were the purported focus of the article (specifically, turnover, work environment, and deliverables);

m.  After the Prospect and Ms. McShane published the article, Ms. McShane continued to promote and republish the false and defamatory statements by contacting Dr. Mason's peers at other organizations, notwithstanding that such communications served no journalistic purpose and instead served her, the Prospect's, and Dr. Hartmann's desire to bring about harm to Dr. Mason; and

n.  The Prospect and Ms. McShane bragged about causing Dr. Mason to be fired.

124.  These facts and circumstances also establish that the Prospect (through its agents) and Ms. McShane acted with evil motive, actual malice, deliberate oppression, or with intent to injure, or in willful disregard for the rights of Dr. Mason, and that their conduct itself was outrageous, grossly fraudulent, or reckless toward Dr. Mason.

125.  The Prospect and Ms. McShane made the false and defamatory statements without privilege.

126.     As a direct and proximate result of the Prospect's and Ms. McShane's false and defamatory statements, Dr. Mason's reputation was severely harmed thus resulting in significant damages, including as follows:

    a.   Dr. Mason lost her job as President/CEO of IWPR and has been unable to obtain other employment as an executive leader, and may not be able to obtain employment as an executive leader for quite some time, if ever, thus resulting in many hundreds of thousands of dollars in lost income;

    b.   Dr. Mason has lost and will continue to lose other professional opportunities, such as paid speaking opportunities which can pay tens of thousands of dollars per engagement;

    c.   Dr. Mason has incurred and will continue to incur significant expenses to repair her reputation and to regain employment as an executive leader, including expenses for public relations consultants and executive leadership coaching which she anticipates totaling tens of thousands of dollars; and

    d.   Dr. Mason has suffered severe emotional distress, including feelings of humiliation and despair that have adversely affected her mental health and daily life and necessitated counseling and therapy.

## COUNT II
## Tortious Interference with Business Relations

127.     Paragraphs 1 through 114 above are incorporated by reference here.

128.     On November 29, 2022, the Prospect and Ms. McShane published on the Prospect's website an article titled "A Women's Policy Giant Struggles Amid New Leadership." The article was authored by Ms. McShane.

129.     The article states that it was a product of an investigation by the Prospect.

130.    The Prospect assumed responsibility for the article's content by publishing the article on its website and adopting the article as its own.

131.    Prior to the publication of the article, Dr. Mason was employed by IWPR as its President/CEO.

132.    Prior to the publication of the article, the Prospect (through its agents) and Ms. McShane were aware that Dr. Mason was employed by IWPR as its President/CEO.

133.    The Prospect (through its agents) and Ms. McShane published the article with the intention of interfering with Dr. Mason's employment relationship with IWPR by creating a public controversy regarding her leadership using false, misleading, and/or defamatory statements about Dr. Mason's leadership of IWPR.

134.    Their intention to interfere with Dr. Mason's employment relationship may be inferred from the facts and circumstances of the article's publication, including but not limited to the following:

    a.    Dr. Mason, IWPR, and funders provided to the Prospect and Ms. McShane detailed information refuting key allegations (such as those relating to turnover, work environment, and fulfillment of research obligations) but the Prospect and Ms. McShane disregarded the information;

    b.    Ms. McShane had access to sources of information that contradicted her reporting;

    c.    The article reads like a "hit piece," thus evincing an intention to cause harm to Dr. Mason;

d.  The Washington Post refused to publish the article, presumably because the article was deemed unsupported by the facts and/or otherwise did not meet accepted journalistic standards;

e.  The Prospect's publication of the article was highly unusual because the article's nature differed substantially from the Prospect's stated purpose and other published journalism;

f.  Dr. Hartmann, who wanted to regain influence at IWPR and made no secret of her disliking of Dr. Mason, has had a many-years-long friendship with Robert Kuttner, Co-Founder and Co-Editor of the Prospect, and friendships with others affiliated with the Prospect, and, upon information and belief, used those relationships to get the article published;

g.  The article does not disclose Dr. Hartmann's many-years-long friendship with Mr. Kuttner and friendships with others affiliated with the Prospect;

h.  The article does not disclose that IWPR terminated Dr. Hartmann for creating a toxic work environment and other failings and instead gratuitously refers to her as a "genius";

i.  The article does not disclose that Ms. McShane had previously applied to work for an organization that Dr. Mason led before being hired by IWPR and that the organization rejected the application;

j.  The article emphasizes research work relating to minorities and statements made by a minority, so as to conceal that the article was the product of a mostly White cast of instigators, including Dr. Hartmann, Ms. McShane, and Mr. Kuttner, who conspired together to take down Dr. Mason, who is African American;

k.  The article links to false and defamatory statements about Dr. Mason which were posted on Glassdoor.com notwithstanding that the statements were posted anonymously and thus could not be verified;

l.  The article smears Dr. Mason by referencing a donation made by the wife of the owner of the Washington Commanders, notwithstanding that the donation had nothing to do with any of the management issues that were the purported focus of the article (specifically, turnover, work environment, and deliverables);

m.  After the Prospect and Ms. McShane published the article, Ms. McShane continued to promote and republish the defamatory statements by contacting Dr. Mason's peers at other organizations, notwithstanding that such communications served no journalistic purpose and instead served her and Dr. Hartmann's desire to bring about harm to Dr. Mason; and

n.  The Prospect and Ms. McShane bragged about causing Dr. Mason to be fired.

135.  These facts and circumstances also establish that the Prospect (through its agents) and Ms. McShane acted with evil motive, actual malice, deliberate oppression, or with intent to injure, or in willful disregard for the rights of Dr. Mason, and that their conduct itself was outrageous, grossly fraudulent, or reckless toward Dr. Mason.

136.  As a direct and proximate result of the Prospect's and Ms. McShane's publication of the article:

a.  Dr. Mason lost her job as President/CEO of IWPR and has been unable to obtain other employment as an executive leader, and may not be able to obtain employment as an executive leader for quite some time, if ever, thus resulting in many hundreds of thousands of dollars in lost income;

35

b.  Dr. Mason has incurred and will continue to incur significant expenses to regain
    employment as an executive leader, including expenses for public relations
    consultants and executive leadership coaching which she anticipates totaling tens
    of thousands of dollars; and

c.  Dr. Mason has suffered severe emotional distress, including feelings of
    humiliation and despair from having lost her job that have adversely affected her
    mental health and daily life and necessitated counseling and therapy.

WHEREFORE, Plaintiff, C. Nicole Mason, requests a judgment against Defendants, The
American Prospect, Inc. and Julianne McShane,

a.  holding Defendants jointly and severally liable for compensatory damages in the
    amount of not less than $1,000,000.00, or such higher amount as may be proven
    at trial;

b.  holding Defendants jointly and severally liable for punitive damages in the
    amount of not less than $1,000,000.00, or such higher amount as may be proven
    at trial;

c.  awarding a permanent injunction requiring The American Prospect, Inc. to
    remove the defamatory statements from its website and to publish a retraction;

d.  awarding pre- and post-judgment interest and costs; and

e.  granting such further relief as may be appropriate.

## **JURY DEMAND**

Plaintiff, C. Nicole Mason, demands trial by jury in this action of all issues triable by
jury.

Respectfully submitted,

/s/ Douglas C. Melcher

_____
Douglas C. Melcher, DC Bar No. 466148
MELCHER LAW
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015
202-427-5753 (direct)
dmelcher@melcherlaw.com
www.melcherlaw.com
*Counsel for Plaintiff C. Nicole Mason*