# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHATAQUOA NICOLE MASON,

       *Plaintiff,*

    v.

AMERICAN PROSPECT, INC., *et al.*,

       *Defendants.*

Civil Action No. 23-2238 (LLA)

## MEMORANDUM OPINION

Plaintiff Chataquoa Nicole Mason brings this action against Defendants *The American Prospect* ("*TAP*") and Julianne McShane. Dr. Mason alleges that *TAP* and Ms. McShane defamed her and tortiously interfered with her business relations when they published an article (written and reported by Ms. McShane) covering her tenure as President and Chief Executive Officer of the Institute for Women's Policy Research ("IWPR"). ECF No. 1 ¶ 1. Pending before the court is Defendants' Motion to Dismiss, ECF No. 4, and Motion for Judicial Notice, ECF No. 5. For the reasons explained below, the court will partially grant the motion for judicial notice and fully grant the motion to dismiss.

## I.        Factual Background

The following factual allegations from Dr. Mason's complaint, ECF No. 1, are accepted as true for the purpose of evaluating the motion before the court. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). The court further includes facts from the article itself

and several of Defendants' exhibits to their motion to dismiss, which are properly considered as incorporated by reference into Dr. Mason's complaint.[1]

### A.      Dr. Mason's Tenure at IWPR

IWPR is a "national think tank" that "build[s] evidence to shape policies that grow women's power and influence, close inequality gaps, and improve the economic well-being of families." ECF No. 1 ¶ 7 (alteration in original). The organization was founded by Dr. Heidi Hartmann, who served as its long-time President and Chief Executive Officer. *Id.* ¶ 15. In 2019, IWPR's Board of Directors removed Dr. Hartmann from these roles because she was "abusing staff and otherwise creating a toxic work environment, engaging in racist behavior . . . and failing to adequately fundraise." *Id.* ¶ 19.

IWPR searched for a new President and Chief Executive Officer and hired Dr. Mason in fall 2019. *Id.* ¶¶ 20, 22, 25. Dr. Mason is an African American woman who holds a Ph.D. in Political Science, boasts "more than twenty years of research and advocacy experience focused on women's economic security," and has a "long track record of success in leadership positions." *Id.* ¶ 24. She entered her new role in a time of tumult, facing budget shortfalls, staff discontentment, and racism. *Id.* ¶ 26. Nevertheless, "she worked tirelessly to achieve major goals," like "dealing with the toxic work environment," raising sorely needed funds (including closing a budget shortfall of more than one million dollars), and increasing the public profile of the organization. *Id.* ¶¶ 27-28. Dr. Mason "participate[d] in public forums and networking events," *id.* ¶ 31, "spearhead[ed] two major conferences," won an industry award, and "was named one of the World's Greatest Leaders by *Fortune Magazine*," *id.* ¶ 27.

---

[1] The court explains the legal basis for its decision with respect to these materials in Part IV(A).

Despite her efforts, Dr. Mason continued to face challenges at IWPR.  Because of the aforementioned budget shortfall, she was "forced to delay critical staff hires."  *Id.* ¶ 28.  Within her first week, she "documented racial discrimination and bias" in the organization.  *Id.* ¶ 44.  Some employees bristled at her leadership, and another executive agreed that "race played a critical role in how Dr. Mason was treated."  *Id.*  Further, Dr. Hartmann—who aimed to "maintain her power and influence" at IWPR even after her ouster from leadership—sought to undermine Dr. Mason's authority "and sabotage her leadership and management."  *Id.* ¶¶ 33-34; *see id.* ¶¶ 32-43.  As a result, Dr. Mason banned Dr. Hartmann from IWPR's offices.  *Id.* ¶ 36.  She also terminated three individuals "closely associated with Dr. Hartmann": Chandra Childers, Jeff Hayes, and Ariane Hegeswich.  *Id.* ¶ 42.  Some other employees with close ties to Dr. Hartmann "left of their own volition."  *Id.*

### B.       The Article

At some point, Ms. McShane, a freelance reporter, began investigating Dr. Mason's leadership of IWPR.  *Id.* ¶¶ 3, 45.  While Ms. McShane had "initially pitched" the story to *The Washington Post*, the outlet ultimately did not publish it, but *TAP* did.  *Id.* ¶¶ 48, 50, 56.  In the course of her reporting, Ms. McShane interviewed twenty-seven former IWPR employees and reviewed many of the organization's internal documents, including emails, grant proposals, and records of board meetings.  *Id.* ¶ 47; ECF No. 4-5 at 2.  She also communicated directly with Dr. Mason via email.  ECF No. 1 ¶ 69; ECF No. 4-9 and 4-10.

In November 2022, *TAP* published the article, titled "A Women's Policy Giant Struggles Amid New Leadership."  ECF No. 4-5; Julianne McShane, *A Women's Policy Giant Struggles Amid New Leadership*, *The American Prospect* (Nov. 29, 2022), https://perma.cc/P9CY-3V3V.  The article highlighted several of Dr. Mason's and IWPR's key accomplishments, including her

recognition by *Fortune* magazine and IWPR's successful fundraising efforts. *Id.* at 2-5. The article also includes the following statements relevant to Dr. Mason's claims:

- "[W]ithin weeks after this reporter sent Mason and two executive board members separate lists of detailed questions based on the reporting in this story, a law firm [was] retained by the board to assist with an independent review of IWPR's workplace environment [and] began contacting former staffers for interviews, according to three sources." *Id.* at 3.

- "[Dr.] Mason fired Childers last fall after seven years at the organization . . . [and] did not respond to a specific inquiry about why Childers was fired." *Id.* at 4.

- "[R]ecords and interviews with former staffers suggest that Mason has struggled to ['get on a winning team' or 'follow through on projects and complete tasks'] during her nearly three years leading IWPR, instead contributing to a toxic work environment that led them to leave the organization." *Id.* at 5.

- "[IWPR]'s turnover rate was 80 percent last year and is 72 percent [UPDATE: 78 percent] so far this year, according to the *Prospect*'s analysis of staff departures. IWPR currently has only three full-time researchers on staff, compared to 14 who were on staff in the fall of 2020, according to a written record of a board meeting from that time." *Id.* at 5 (second alteration in original).

- "[Dr.] Mason did not respond to a question from the *Prospect* about what she believes has caused the turnover [of employees]." *Id.* at 6.

- "[Michelle Cueller Hawks[2]] worked alone and struggled to get Mason's attention, even though Mason was her direct supervisor[.]  When she and Mason did interact, it was often fraught . . . . [Cuellar] said Mason sometimes had what [other employees] considered unfair expectations that she sometimes expressed by screaming at staffers, or in other demeaning ways." *Id.* at 6.

- "Former staffers say the high turnover has undermined the organization's capacity to conduct the research it once pioneered—and records of board meetings show Mason has admitted as much." *Id.* at 7.

- "Representatives for the Kresge Foundation, the Children's Defense Fund, and the Women's Foundation of Florida declined requests for comment on the IWPR projects they funded." *Id.* at 8.

- "Records of board meetings show that at least four current and one former board member have raised concerns about staffing and turnover and offered to intervene. . . .  [B]oard member Joan Marsh . . . asked 'if the staffing challenges

---

[2] The court will defer to the complaint's spelling of Ms. Cueller Hawks's name. *Compare* ECF No. 1 ¶ 71, *with* ECF No. 4-5, at 6.

undermine[] the commitments made to our funders,' according to a written summary of the meeting." *Id.* at 8.

- "None of IWPR's six research priority areas, including the Center for the Economics of Reproductive Health, currently have leaders. . . . IWPR was supposed to produce three original research reports using the initial Hewlett grant money . . . [b]ut none of those reports were released after the center's founding director left IWPR in March 2020." *Id.* at 8-9.

- "IWPR's Student Parent Success Initiative . . . , [which] launched in 2010 with $1 million from the Bill and Melinda Gates Foundation, . . . has remained unstaffed since its last staffer, a research associate, left in February." *Id.* at 9. "[The SPSI's] Student Parent Policy Working Group has seemingly disbanded." *Id.* at 10.

- "IWPR received a $225,000 donation from Daniel Snyder, the owner of the Washington Commanders football team, according to notes from a board meeting." *Id.* at 11.

### C.    The Aftermath

After publication, individuals associated with *TAP* and anonymous sources from the article "contacted IWPR's Board, funders, and other key stakeholders to disparage Dr. Mason." ECF No. 1 ¶ 99.  IWPR employees also began to "question[] Dr. Mason's leadership . . . due to the controversy." *Id.* ¶ 102.  In January 2023, roughly two months after the article's publication, IWPR's Board fired Dr. Mason.  *Id.* ¶ 101; *see id.* ¶ 56.

Since then, Dr. Mason has been unable to find employment.  *Id.* ¶ 110.  In addition to incurring expenses to rehabilitate her reputation, she "has also suffered severe emotional distress" as a result of the article's publication.  *Id.* ¶ 114.

### II.    Procedural History

In August 2023, Dr. Mason sued *TAP* and Ms. McShane for defamation and tortious interference with business relations.  ECF No. 1.  *TAP* and Ms. McShane moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), ECF No. 4, and also asked the court to take judicial notice of several articles, orders, and email exchanges, ECF No. 5.  After both motions were fully

briefed, ECF Nos. 4, 5, 10, 11, 12, the case was reassigned to the undersigned in December 2023, Docket, No. 23-CV-2238 (D.D.C. Dec. 15, 2023).

### III.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that are more than "'merely consistent with' a defendant's liability" and that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 557); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires 'more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Iqbal*, 556 U.S. at 678)). "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *Banneker Ventures*, 798 F.3d at 1129 (alterations in original) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). The court will only "assume [the] veracity" of "well-pleaded factual allegations." *Iqbal*, 556 U.S. at 679. Conclusory allegations are "not entitled to the assumption of truth." *Id.* at 680-81.

When ruling on a motion to dismiss, the court may only consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). "If the district court considers other facts, it must convert the motion to dismiss into a motion for summary judgment and 'provide the parties with notice and an opportunity to present evidence in support of their respective positions.'" *Id.* (quoting *Kim v.*

*United States*, 632 F.3d 713, 719 (D.C. Cir. 2011)).  "The decision to convert a motion to dismiss into a motion for summary [judgment] . . . is committed to the sound discretion of the trial court." *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006).

### IV.    Discussion

The court begins by addressing Defendants' Motion for Judicial Notice, ECF No. 5, which it will grant in part and deny in part.  It then addresses whether Dr. Mason's claims for defamation and tortious interference with business relations can survive Defendants' motion to dismiss.  While some of the allegedly defamatory statements can support a defamation claim, the court concludes that Dr. Mason cannot plead actual malice.  And because her tortious interference claim rises and falls with her defamation claim, the court will dismiss the complaint in its entirety.

### A.    Defendants' Motion for Judicial Notice

As a threshold matter, the court must address Defendants' motion requesting that the court take judicial notice of several exhibits attached to their motion to dismiss, ECF No. 5: the article giving rise to Dr. Mason's claims, ECF No. 4-5; a subsequent article published by *TAP* covering Dr. Mason's departure from IWPR, ECF No. 4-6; news articles about or quoting Dr. Mason (including several written by Ms. McShane), ECF Nos. 4-7 & 4-8; emails exchanged between Dr. Mason and Ms. McShane through the reporting process for the *TAP* article, ECF Nos. 4-9 to 4-11; and an order and a news article that were part of the record in an unrelated case in the Superior Court of the District of Columbia, ECF Nos. 4-12 & 4-13.  Dr. Mason "does not formally oppose the motion but urges the court to exercise extreme caution in deciding whether and how to use the materials," and she notes that they "should not be used to decide any issue of contested fact" related to the case.  ECF No. 11, at 1.  The court will partially grant the motion and take judicial notice of most of the materials, subject to the constraints and exclusions described below.

1.      **The *TAP* article and subsequent article covering Dr. Mason's departure**

"Incorporation by reference can . . . amplify pleadings where the document is not attached by the plaintiff, but is 'referred to in the complaint and [] integral to [the plaintiff's] claim.'" *Banneker Ventures*, 798 F.3d at 1133 (D.D.C. 2015) (alterations in original) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)).  The *TAP* article—which is the source of Dr. Mason's defamation claim—is extensively quoted from and referred to in the complaint.  *See generally* ECF No. 1.  Thus, the article has been incorporated by reference.  Such a conclusion is unsurprising; courts routinely consider the publication containing an alleged defamatory statement when resolving a motion to dismiss.  *See, e.g.*, *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 8-9 (D.D.C. 2021), *aff'd*, No. 21-7099, 2022 WL 1463866 (D.C. Cir. May 10, 2022) (per curiam).  The court notes, however, that it does not adopt the factual contents of the article as true.  *See Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 154 (D.D.C. 2018).  *Cf. Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 132 n.1 (D.D.C. 2016) ("The Court takes judicial notice of the articles not for their truth but merely for the fact that they were published.").

The same is true of a subsequent *TAP* article titled "Leader of Women's Policy Giant Out Following Prospect Investigation."  Dr. Mason references this follow-up article in her complaint, ECF No. 1 ¶ 106, and includes a link to it (effectively attaching it to her complaint).  She references this article to support her theory that the initial *TAP* article led to her termination from IWPR, so it is "integral" to her theory of damages for the defamation claim.  *See id.* ¶¶ 106-14.  Accordingly, the court may consider it at the pleading stage without converting Defendants' motion to dismiss into one for summary judgment.

2.      **News articles about or quoting Dr. Mason**

The court additionally concludes that it can take judicial notice of news articles for the "existence or nature of the articles"—and may do so without converting the motion into one for

summary judgment—but it may not consider the articles for the truth of their assertions. *Fridman v. Bean LLC*, No. 17-CV-2041, 2019 WL 231751, at *5 n.1 (D.D.C. Jan. 15, 2019); *see Shive-Ayala v. Pacelle*, No. 21-CV-704, 2022 WL 782412, at *2 n.1 (D.D.C. Mar. 15, 2022) (taking judicial notice of news articles without converting the motion to dismiss into a motion for summary judgment); *Hourani*, 164 F. Supp. 3d at 132 n.1 ("The Court takes judicial notice of the articles not for their truth but merely for the fact that they were published."). Neither party disputes that these articles were published, and news articles are a classic subject of judicial notice. *Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991). But, as with all judicially noticed materials, it would not be proper to accept the assertions in the articles for the truth of the matters asserted. *See, e.g.*, *Hurd*, 864 F.3d at 686 ("[A] court cannot take judicial notice of the truth of a document simply because someone put it in the court's files" (alteration in original) (quoting 21B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5106.4 (2d ed. 2017))); *Masek v. United States*, No. 22-CV-3574, 2024 WL 1240093, at *7 (D.D.C. Mar. 24, 2024) (taking judicial notice of publicly filed pleadings but not "consider[ing] the factual matters within the pleadings as true"). Accordingly, the court will take judicial notice of the articles as demonstrating the existence of news coverage related to Dr. Mason's leadership and public outreach while serving as President and Chief Executive Officer of IWPR—which Dr. Mason openly alleges in her complaint, ECF No. 1 ¶¶ 27, 31—but not for the truth of any statements contained in the articles.

### 3.   Emails exchanged between Dr. Mason and Ms. McShane throughout the reporting process

Next, Defendants seek to include three separate email exchanges between Dr. Mason and Ms. McShane, arguing that they have been incorporated by reference into Dr. Mason's complaint. ECF No. 5, at 2. The court concludes that two of them are properly incorporated.

The first exchange occurred on October 4, 2022, and consists of Dr. Mason's on-the-record statement, a statement from IWPR's Board, and several attachments providing "background information for context" for what would become the *TAP* article. ECF No. 4-9, at 2-24. Dr. Mason references this exchange extensively in her complaint, including by directly quoting it twice. ECF No. 1 ¶¶ 69-70, 75. The second exchange occurred on November 23, 2022. ECF No. 4-10, at 2-4. In it, Dr. Mason provided more background materials and on-the-record statements, questioned Ms. McShane's calculation of the staff turnover rate at IWPR, and denied any accusations of yelling at IWPR employees. *Id.* at 3. Ms. McShane then replied to explain how she had calculated the turnover rate. *Id.* at 2-3. Dr. Mason references this exchange several times in her complaint. ECF No. 1 ¶¶ 55, 69-70, 123(a), 134(a). Both email exchanges are integral to Dr. Mason's defamation claim because they go to the truth or falsity of the allegedly defamatory statements, as well as to Defendants' culpability.

In the last email exchange, ECF No. 4-11, Dr. Mason forwarded Ms. McShane an internship application from several years earlier, when Ms. McShane had "applied to work for an organization Dr. Mason led before being hired by IWPR." ECF No. 1 ¶ 66. Ms. McShane was not hired for the role. *Id.* This email exchange is not relevant to the court's analysis of Dr. Mason's claims. Accordingly, the court will disregard it.

### 4. Order and a news article from a D.C. Superior Court case

Finally, Defendants seek to introduce an order and a news article from the record in *Berry v. Current Publication*, No. 2020-CA-4366-B (D.C. Super. Ct. 2021). It is well established that the court may take judicial notice of another court's proceeding, and the court will do so here. *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088 (D.C. Cir. 2007) ("*Jankovic I*") (taking judicial notice of exhibits in the record of another court's proceedings).

### B.    Defamation (Count I)

Dr. Mason raises one count of defamation based on eight groups of statements in the *TAP* article.  ECF No. 1 ¶ 122.  Under District of Columbia law,

> to state a claim of defamation, [a] "plaintiff must allege and prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."

*Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)).  The third element, fault, depends on whether the plaintiff is a public figure—subject to the heightened actual malice standard of proof—or is instead a private individual—subject to the lower negligence standard.  *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 n.33 (D.C. 2016).  And the fourth element, harm, can be shown if the statement "tends to injure the plaintiff in [her] trade, profession[,] or community standing, or to lower [her] in the estimation of the community."  *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013).

For "a challenged statement to be actionable as defamation, 'it must at a minimum express or imply a verifiably false fact'" about the plaintiff.  *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 276 (D.D.C. 2017) (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001)).  This is because the First Amendment protects statements "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" in an effort to ensure "that public debate [does] not suffer."  *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (first alteration in original) (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988)).  For this reason, statements of opinion are generally not actionable because they often are "so imprecise or subjective that [they are] not capable of being proved true or false."  *Farah*, 736 F.3d at 534-35.

Truthful statements, including ones that are "substantially true," are also not actionable. *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144, 1150 (D.C. Cir. 1994) ("*Moldea I*"). And "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (quoting *Heuer v. Kee*, 59 P.2d 1063, 1064 (Cal. Ct. App. 1936)). In other words, a "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* (quoting Robert D. Sack, *Libel, Slander, and Related Problems* 138 (1980)).

When a plaintiff alleges defamation against a media organization for speech relating to issues of "public concern," the "common-law presumption that defamatory speech is false cannot stand." *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986). In such cases, the "plaintiff . . . must make a showing of falsity as an element of his affirmative case." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). In practice, this means that the plaintiff must allege sufficient facts to create a plausible inference that an allegedly defamatory statement is untrue. *See id.*

Finally, a defamation claim can be sustained either by express words or by the implication of the defendant's statements. *White v. Fraternal Ord. of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). A defamation-by-implication claim must establish that the statement, viewed in its entire context, was capable of defamatory meaning, and that it implied provably false statements of fact. *Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 586 (D.C. 2022). "[I]t is not enough that a statement can 'be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses that that inference.'" *Id.* (quoting *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000)).

12

Defendants begin by arguing that Dr. Mason's complaint is defective because the challenged statements in the *TAP* article are not false and defamatory. ECF No. 4-2, at 14-27. They further contend that Dr. Mason is a limited-purpose public figure and cannot meet the heightened "actual malice" standard. *Id.* at 29-32; *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). After considering the relevant arguments, the court concludes that Dr. Mason is a limited-purpose public figure subject to the actual malice standard, and that she has failed to state a claim for defamation.

## 1.      Challenged Statements

As discussed, statements that are true or substantially true are not actionable for defamation. *Moldea I*, 15 F.3d at 1144, 1150. Thus, when a "trial court can find as a matter of law that a challenged publication is substantially true, then it may properly grant judgment for the defendant." *Id.* at 1150; *see Libre By Nexus*, 311 F. Supp. 3d at 154 (dismissing complaint for failure to state a defamation claim because it "[did] not contain factual allegations that g[a]ve rise to a plausible inference that the challenged statement in the Article [was] false" (emphasis omitted)).

Dr. Mason alleges that the *TAP* article contains "numerous false and defamatory statements," ECF No. 1 ¶ 122, that can be grouped into the following categories: (a) Dr. Mason's response (or lack thereof) to questions from Ms. McShane; (b) IWPR's staffing issues; (c) IWPR's work environment; (d) Dr. Mason's relationships with IWPR personnel; and (e) IWPR's ability to meet research goals, produce deliverables, and secure funding. Dr. Mason also suggests in her complaint, and clarifies in her opposition, that her claim is based on the narrative of the *TAP* article as a whole. *Id.*; ECF No. 10-1, at 13-14, 21 (referring to a defamatory narrative or theme in the *TAP* article). The court addresses the specific statements first, then considers the narrative of the article as a whole.

### a.      Dr. Mason's responses to questions

Dr. Mason alleges that the *TAP* article "falsely states that [she] did not respond to questions while insinuating that the alleged failure to respond supported the article's narrative that [her] management and leadership of IWPR [were] seriously flawed."  ECF No. 1 ¶ 122(a).  Defendants counter that the article does not contain any falsity and instead makes clear that Dr. Mason participated in its reporting.  ECF No. 4-2, at 14-15.  Further, Defendants purport that Dr. Mason "responded to some questions and declined to respond to others," which the article truthfully reflects.  *Id.* at 15.  The court agrees with Defendants and concludes that the statements about Dr. Mason's level of responsiveness cannot support a defamation claim.

The *TAP* article makes clear that Dr. Mason *did* respond to many of Ms. McShane's questions and even provided an official statement.[3]  ECF No. 4-5 at 2-3 ("In statements provided to the *Prospect*, both Mason and the board of directors . . . initially rejected former staffers' claims that the organization is in crisis."), 5 ("In her statement provided to the *Prospect*, Mason rejected the claim that she has deprioritized research."), 6 ("Mason said she categorically denies any allegations of yelling at staff.").  Accordingly, the article does not broadly state that Dr. Mason declined to respond to questions and no reasonable reader could interpret it that way.

The article instead says that Dr. Mason declined to respond to *specific* questions, and Dr. Mason fails to establish the falsity of these statements.  Her complaint focuses on two topics: Dr. Childers's firing, *id.* at 4 ("Mason did not respond to a specific inquiry about why

---

[3] The court need not "accept as true the complaint's factual allegations insofar as they contradict . . . matters subject to judicial notice."  *Kaempe*, 367 F.3d at 963.  Thus, the court does not need to accept Dr. Mason's description of the article; it may look directly to the source material.

Childers was fired."), and IWPR's turnover rate, *id.* at 6 ("Mason did not respond to a question from the *Prospect* about what she believes has caused the turnover.").[4]  ECF No. 1 ¶ 69.

With respect to Dr. Childers's firing, Dr. Mason alleges in her complaint that she "provided Ms. McShane with . . . a statement regarding [her] termination."  ECF No. 1 ¶ 69.  To support this, Dr. Mason quotes from an October 4, 2022 email attachment, *id.* ¶ 69 (referencing ECF No. 4-9, at 4-8).  This falls short.  First, Dr. Mason did not present the statement as attributable to her.  Instead, it was labeled as "on-background information" to be "sourced as 'a person close to the organization.'"  ECF No. 4-9, at 4.  Second, even if Dr. Mason had taken credit for the statement, it contained language that the speaker "[could not] comment on specific personnel matters" and it failed to provide any information specific to Dr. Childers.  ECF No. 1 ¶ 69; ECF No. 4-9, at 6.  Indeed, the statement does not even mention Dr. Childers by name.  That is entirely consistent with the article's characterization that Dr. Mason "did not respond to a specific inquiry about why Childers was fired."  ECF No. 4-5, at 4.

With respect to IWPR's turnover rate, the article states that Dr. Mason "did not respond to a question . . . about what she believes has caused the turnover."  ECF No. 4-5, at 6.  The information that Dr. Mason provided on background addresses some of the causes of the turnover, but again, Ms. McShane was instructed to source this to a "person close to [IWPR]," not to Dr. Mason herself.  ECF No. 4-9, at 4.  The "gist" of the article's statement is that Dr. Mason did

---

[4] The article further reflects that Dr. Mason did not respond to specific inquiries on the topics of: (1) Ms. Cueller Hawks's and other early career researchers' departures from IWPR, ECF No. 4-5 at 7; (2) the status of reports for a large grant that had not been released, *id.* at 9; (3) understaffing on certain projects, *id.* at 9-10; and (4) former staffers' concerns about a grant originating with Dan Snyder, *id.* at 11.  Dr. Mason does not address these particular statements in her complaint or her opposition, so the court considers them unchallenged.

not respond to a particular question "about what she believes has caused the turnover." *Masson*, 501 U.S. at 517 (quoting *Heuer*, 59 P.2d at 1064). That assertion is substantially true.

Finally, Dr. Mason cannot demonstrate that she was defamed because the statements imply that her "management and leadership of IWPR [were] seriously flawed." ECF No. 1 ¶ 122(a). Defamation can be implied when a statement, viewed in its entire context, is capable of a defamatory meaning and implies provably false statements of fact. *Fells*, 281 A.3d at 586. "[I]t is not enough that a statement can 'be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses that inference.'" *Id.* (quoting *Guilford Transp. Indus*, 760 A.2d at 596). But, as discussed above, the article's representations are substantially true and thus not defamatory. In addition, whether Dr. Mason's "management and leadership of IWPR [were] seriously flawed," ECF No. 1 ¶ 122(a), is an opinion, not a "verifiably false fact," *Weyrich*, 235 F.3d at 624. Readers are free to make their own conclusions based on the article's truthful representations about Dr. Mason's responsiveness, but the challenged statements do not support a claim for defamation. *See Farah*, 736 F.3d at 539.

### b.      IWPR's staffing issues

Dr. Mason alleges that the *TAP* article "falsely states that IWPR's turnover was much higher than it actually was," that "Dr. Mason 'admitted' that the alleged high turnover undermined IWPR's research capacity," and that "one of IWPR's research areas (SPSI) did not have research staff and had been abandoned." ECF No. 1 ¶ 122(b), (c), (h). Defendants argue that each statement is substantially true. ECF No. 4-2, at 16-22. The court concludes that the article's statements about the turnover rate and lack of staffing were sufficiently false and defamatory but holds that the "admission" statement is not actionable.

First, the article reported IWPR's turnover rate to be "80 percent" in 2021, and "72 percent" at the time of publication in November 2022. ECF No. 4-5, at 5. *TAP* later updated

the 2022 figure to "78 percent." *Id.* Dr. Mason asserts that "[t]he highest attrition rate for any year during [her] time as IWPR's President/CEO was 44 percent, and for all other years, it was substantially less." ECF No. 1 ¶ 70. At this stage in the proceedings, the court must accept the complaint's 44% figure as true. *Iqbal*, 556 U.S. at 678. The article's much higher figures are both capable of defamatory meaning and false. Defendants do not meaningfully dispute this, instead arguing that "[t]he 'gist' of the statement—that *numerous* employees left IWPR during Dr. Mason's tenure . . . is substantially true." ECF No. 4-2, at 18 (quoting *Air Wis. Airlines v. Hoeper*, 571 U.S. 237, 247 (2014)). But attempting to convey that "numerous" individuals left IWPR is much different than providing a precise—and as the court must assume, grossly inaccurate—mathematical figure. Here, reporting a rate of 80% is not the type of "[s]light inaccurac[y] of expression" that would be "immaterial provided that the defamatory charge is true in substance." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988) (quoting Restatement (Second) of Torts § 581A cmt. f (1977)). Therefore, the incorrect turnover figures are sufficiently defamatory to support a claim.

Next, Dr. Mason alleges that the article falsely claims that she admitted that the turnover undermined IWPR's work. ECF No. 1 ¶ 122(c). Specifically, the article states that "records of board meetings show Mason has admitted as much." ECF No. 4-5, at 7. Defendants suggest that this statement is materially true, ECF No. 12, at 14, and the court agrees. Although Dr. Mason states that she "has never admitted or otherwise said that high turnover has undermined the organization[]," ECF No. 1 ¶ 83, she does not dispute records from a board meeting in which she stated "[IWPR] could be doing more if hired to [its] capacity" in response to a question about "staffing challenges." ECF No. 10-1, at 20; ECF No. 4-5, at 8; ECF No. 1 ¶ 84. While Dr. Mason suggests that these statements are materially different from one another, the court does not see

such daylight. They communicate the same "gist"—understaffing prevented IWPR from maximizing its potential. Accordingly, the statement is not actionable because it is substantially true.

Finally, Dr. Mason asserts that the article "falsely states that one of IWPR's research areas (SPSI) did not have research staff and had been abandoned." ECF No. 1 ¶ 122(h). Dr. Mason alleges that, at the time the article was published, "two women of color had already been hired in the SPSI research area" and that "[t]his information was provided to Ms. McShane prior to publication." *Id.* ¶ 91. While the complaint slightly overstates the article's language (there is no claim that SPSI was "abandoned"), the article does assert that the SPSI group was "unstaffed" beginning in February 2022 and continuing through the time of publication. ECF No. 4-5, at 9. Defendants counter that the "substance" and "gist" of the article's assertions—that SPSI did not have researchers "for a significant part of 2022"—is true. ECF No. 4-2, at 27 (quoting *Air Wis. Airlines*, 571 U.S. at 247). But claiming that a research group is "unstaffed" at a specific point in time when it actually is not can support a defamation claim.

### c.   IWPR's work environment

Dr. Mason next takes issue with the *TAP* article's statement that some employees attributed IWPR's turnover rate to her management style, believed she created a "toxic work environment," and claimed that she "engaged in yelling and screaming at employees." ECF No. 1 ¶¶ 74, 122(b) & (d); ECF No. 10-1, at 16-20. Defendants argue that these statements are protected opinions because they are not objectively verifiable as true or false. ECF No. 4-2, at 18-21. The court agrees with Defendants.

Starting with the statements about the source of IWPR's turnover, the article recounts that "several former staffers say Mason herself [was] a key cause" because she contributed to a "toxic work environment." ECF No. 4-5, at 5-6. Defendants are correct that these statements are

inactionable opinions.  "[I]n deciding whether the challenged statements are opinion, 'the court must consider whether the allegedly defamatory words are susceptible to proof of their truth or falsity' and statements that cannot 'readily be proven true or false' are 'more likely to be viewed as statements of opinion, not fact.'"  *Armstrong v. Thompson*, 80 A.3d 177, 187 (D.C. 2013) (quoting *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 47 (D.C. 1983)).  In *Armstrong*, statements that the plaintiff had engaged in "serious integrity violations" and "misconduct" reflected the author's "subjective view of the underlying conduct and were not verifiable as true or false."  *Id.* at 188.  The same is true here.  The court cannot conclusively determine whether employees left due to Dr. Mason's behavior because the statements reflect the former employees' subjective opinions about what was driving the exodus.  The court also cannot confirm whether the environment at IWPR was "toxic" due to Dr. Mason's leadership because that reflects individual judgment about the workplace.  ECF No. 4-5, at 6  And describing Dr. Mason's expectations as "unfair" is similarly unverifiable as true or false because each person's perception of fairness differs.  *Id*.

For the same reasons, the article's statements regarding Dr. Mason's alleged "yelling and screaming" are also not actionable.  The article does not definitively say that Dr. Mason yelled or screamed at employees.  *Compare id.* ("[S]everal other former staffers . . . *said* Mason sometimes had what they considered unfair expectations that she sometimes expressed by screaming at staffers"; "[Ms. Cueller Hawks] *recounted* that Mason screamed at her when she took 12 minutes to return Mason's phone call[.]" (emphases added)), *with* ECF No. 1 ¶ 122(d) ("The article falsely states that Dr. Mason engaged in yelling and screaming at employees.").  It instead reports that specific employees *claimed* that Dr. Mason occasionally yelled at staff, and Dr. Mason does not dispute that employees made such claims.  *See* ECF No. 4-5, at 6.  Regardless, whether those

employees perceived Dr. Mason's communications as "screaming" or "yelling" is, again, a matter of perspective and subjective opinion.  Furthermore, the article specifically includes Dr. Mason's "categorical[] deni[al]" of such accusations.  *Id.*

Additionally, with respect to both categories of statements, "[c]ontext is critical . . . '[to] determin[ing] the way in which the intended audience [would] receive'" them.  *Farah*, 736 F.3d at 535 (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 314 (D.C. Cir. 1994) ("*Moldea II*")).  The context of the statements within the article makes clear that Ms. McShane was reporting "an ongoing exchange of charge and countercharge" between former IWPR staff and Dr. Mason. *Abbas v. Foreign Pol'y Grp. LLC*, 975 F. Supp. 2d 1, 18-19 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).  The article does not definitively say that Dr. Mason caused the turnover or that she yelled or screamed at staff.  Instead, it carefully caveats that these are beliefs held by IWPR's former employees, rather than presents them as objective truth.  ECF No. 4-5, at 6.  And the article also states, in no uncertain terms, that "Dr. Mason categorically denies any allegations of yelling at staff." *Id.*  In other words, it allows readers to reach their own conclusions based on the presented information.  *Abbas*, 975 F. Supp. 2d at 18-19.

### d.    Dr. Mason's relationships with IWPR personnel

Dr. Mason next claims that the article falsely identifies her as Ms. Cueller Hawks's "direct supervisor" and suggests that she was "solely responsible for the decision to terminate Dr. Childers."  ECF No. 1 ¶ 122(e).  Defendants argue that the first statement is not defamatory because it does not injure Dr. Mason and that the second is not an accurate description of what was said in the article.  *See Kaempe*, 367 F.3d at 963 (explaining that the court need not "accept as true the complaint's factual allegations insofar as they contradict . . . matters subject to judicial notice").  Again, Defendants have the better of the arguments.

"A statement is 'defamatory' if it tends to injure the plaintiff in [her] trade, profession[,] or community standing, or to lower [her] in the estimation of the community." *Farah*, 736 F.3d at 534.  Dr. Mason does not explain how being identified as Ms. Cueller Hawks's "direct supervisor" harms her reputation, and it is not apparently obvious that such a statement would have any impact on the public's perception of her.  ECF No. 4-5, at 6.

As for Dr. Childers's termination, the article does not state that Dr. Mason "was solely responsible for the decision to terminate Dr. Childers," as the complaint suggests.  ECF No. 1 ¶ 122(e).  It states, much more vaguely, that "Mason fired Childers."  ECF No. 4-5, at 4; *see* ECF No. 1 ¶ 42.  Nonetheless, Dr. Mason takes issue with the article's failure to clarify that terminating Dr. Childers was a collective board decision.  ECF No. 10-1 at 23-24.  But Defendants are not obligated to publish their story on Dr. Mason's preferred terms.  *See* Robert D. Sack, *Sack on Defamation* § 2:4.1 (5th ed. 2023).  And, as was the case above, it is unclear how firing an employee because "she wasn't doing the work she was hired for" would injure Dr. Mason's reputation.  ECF No. 4-5, at 4.

Dr. Mason does not seriously contend with these arguments, instead pivoting her focus to the overall narrative of the article, ECF No. 10-1, at 23-24, which the court addresses below. Accordingly, the court concludes that these statements are not defamatory as a matter of law.

### e.    IWPR's performance, deliverables, and funding

Finally, Dr. Mason challenges the allegedly false statements that, under her leadership, "IWPR was failing to fulfill its obligations to produce reports and other deliverables" and "had lost funding from a foundation (NoVo) due to [a] failure to provide deliverables."  ECF No. 1 ¶ 122(f) & (g).  In a familiar refrain, Defendants argue that the article does not convey such statements and that Dr. Mason also fails to allege defamation by implication.  The court again agrees with Defendants.

21

According to the complaint, the article says that "IWPR was failing to fulfill its obligations to produce reports and other deliverables" and that "[r]esearch was not produced or performed." *Id.* ¶¶ 77, 122(f). But the article simply does not contain these statements. The closest it comes is claiming that "IWPR was supposed to produce three original research reports using the initial Hewlett grant money . . . [b]ut none of those reports were released after the center's founding director left IWPR in March 2020." ECF No. 4-5, at 9. Just a few lines later, the article reports that IWPR and Hewlett made "adjustments to their initial research plan" and that "Hewlett staffers were 'satisfied that the terms of the grant were met.' (IWPR produced four out of five other briefing papers it also proposed for the grant.)." *Id.* Contrary to the complaint's assertions, the article does not make a blanket statement that "[r]esearch was not produced or performed." ECF No. 1 ¶ 77. Dr. Mason does not dispute this in her opposition and therefore concedes that the article did not contain the "precise words" she initially claimed. *Ali v. D.C. Court Servs.*, 538 F. Supp. 2d 157, 161 (D.D.C. 2008) ("If a plaintiff . . . files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). And even if Dr. Mason claims that the complaint's allegations accurately captured the "meaning conveyed by the article," ECF No. 10-1, at 24, she does not allege that the article's representation of the Hewlett grant and its deliverables was actually false.

As to the NoVo grant money, the complaint also does not accurately reflect the article's actual statements. Dr. Mason alleges that the article "falsely insinuates that IWPR . . . lost funding from [NoVo] due to a failure to provide deliverables," ECF No. 1 ¶ 122(g), but the article reports that the NoVo grant "was not tied to the completion of specific reports," ECF No. 4-5, at 8. To be sure, it goes on to say that NoVo "is no longer funding IWPR" and that a NoVo representative

"did not elaborate as to why." *Id.* But the court is not convinced that this implies a connection between undelivered reports and a cessation of funding, especially when the article expressly disclaims such a connection, *id.* (stating that the loss of funding "was not tied to the completion of specific reports"), and does not speculate as to the reason why NoVo stopped funding IWPR's work.

### f.    Overall narrative

Looking past specific statements, Dr. Mason claims in her opposition that the article as a whole pushes a "defamatory narrative . . . that [she] was doing a bad job of leading IWPR." *See, e.g.*, ECF No. 10-1, at 27. This appears to be a defamation-by-implication argument, where a plaintiff alleges that a collection of statements implies provably false facts when understood in context. But Defendants argue that Dr. Mason did not advance such a theory in her complaint, instead choosing to focus on particular groups of statements. ECF No. 12, at 4-5 (citing ECF No. 1 ¶ 122). Defendants are correct that a plaintiff "cannot amend her complaint through her opposition briefing." *Sloan v. Urban Title Servs., Inc.*, 689 F. Supp. 2d 94, 114 (D.D.C. 2010). But even though Dr. Mason does not allege this theory with the utmost clarity, the court finds that there is enough in the complaint to support it. *See* ECF No. 1 ¶ 122(a) (referencing the "article's narrative that Dr. Mason's management and leadership of IWPR [were] seriously flawed").

Assuming that Dr. Mason has properly pleaded an "overall narrative" theory, the argument fails. As previously mentioned, context is critical in defamation claims and the court must take the "publication . . . as a whole[] and in the sense in which it would be understood by the readers to whom it was addressed." *Farah*, 736 F.3d at 535 (quoting *Afro-Am. Publ'g Co. v. Jaffe*, 366 F.3d 649, 655 (D.C. Cir. 1966)). Dr. Mason may believe that the article presents an overarching defamatory narrative. But when viewed holistically, it presents "an ongoing exchange of charge and countercharge" that provides readers with plenty of information from which they can make

their own judgments. *Abbas*, 975 F. Supp. 2d at 19. The article sources each of its assertions, credits quoted sources and materials, and includes Dr. Mason's and IWPR's counterpoints when available. *See* ECF No. 4-5, at 6 ("[Dr. Mason] categorically denies any allegations of yelling at staff."), 8 ("A statement from the board said . . . [e]ach of IWPR's current research projects is well-managed, with personal oversight by Dr. Mason"; "[Board member Joan] Marsh said . . . Dr. Mason has had an open, frequent[,] and productive dialogue with the Board about her progress[.]"). With very few exceptions, the article explains that it is recounting how former employees feel or what they believe about the organization, rather than presenting specific statements as objective truth. For these reasons, the court concludes that the article's overall narrative does not support a defamation-by-implication claim.

### 2.  Actual Malice

In the defamation context, "[t]he applicable fault standard 'turns upon whether the plaintiff is a public or a private figure.'" *Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 645 (D.C. 2023) (quoting *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504 (D.C. 2020)). Private figures may recover if the defendant is negligent. *Id.* But public figures must meet the more demanding "actual malice" standard of liability—meaning they acted "with knowledge that [the relevant statement] was false or with reckless disregard of whether it was false or not." *Hustler Mag.*, 485 U.S. at 52 (quoting *Sullivan*, 376 U.S. at 279-80). The actual malice standard recognizes the tension between the long-established tort of defamation and the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270. Public figures "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood" and boast increased access to media to "counteract false statements." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974). In contrast, "private individuals are 'more vulnerable to injury,' so the 'state interest in protecting them is correspondingly greater.'" *Salem*

*Media Grp.*, 301 A.3d at 646-47 (quoting *Gertz*, 418 U.S. at 344).  These different standards accommodate the need to balance free public discourse and the reputational interests of plaintiffs.

There are three types of plaintiffs who must establish actual malice in a defamation suit:

> (1) a public official; (2) an individual who "achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts," referred to as a general-purpose public figure; and (3) "[m]ore commonly, an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues," i.e., a limited-purpose public figure.

*Id.* at 647 (alterations in original) (quoting *Gertz*, 418 U.S. at 351).  Whether a plaintiff falls into one of these categories "is a question of law for the court to resolve."  *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1293 n.12 (D.C. Cir. 1980).

Defendants argue that Dr. Mason is a limited-purpose public figure and thus subject to the heightened standard of actual malice.  ECF No. 4-2, at 29-33.  The court first concludes that Dr. Mason is a limited-purpose public figure and then applies the actual malice standard to her claims.

### a.       Limited-purpose public figure

A limited-purpose public figure takes on a central role in a particular public controversy, "either by virtue of their own voluntary actions or involuntarily" through her involvement in the controversy at hand.  *Salem Media Grp.*, 301 A.3d at 647; *see Fells*, 281 A.3d at 583.  To determine whether a plaintiff is a limited-purpose public figure, the court first identifies whether a public controversy exists and defines its scope.  *Salem Media Grp.*, 301 A.3d at 647.  Then, if one exists, the court must decide if the plaintiff "[was] shaping or [was] trying to shape the outcome of [the] public controversy."  *Moss v. Stockard*, 580 A.2d 1011, 1031 (D.C. 1990).  If yes, then the court must ask "whether the alleged defamation was germane to the plaintiff's participation in the controversy."  *Id.*

Defendants argue that there is an ongoing public controversy related to gender equity and women's roles in the workforce, that Dr. Mason assumed a prominent role in that controversy, and that the challenged statements (and article as a whole) relate to her role in the controversy.  ECF No. 4-2, at 30-33.  The court agrees.

*Public controversy.*  "A public controversy is 'not simply a matter of interest to the public . . . [but] a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way . . . because its ramifications will be felt by persons who are not direct participants.'"  *Salem Media Grp.*, 301 A.3d at 648 (alterations in original) (quoting *Moss*, 580 A.2d at 1030-31).  "[T]he court 'must examine whether persons actually were discussing some specific question,' looking to 'see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.'"  *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) ("*Jankovic II*") (quoting *Waldbaum*, 627 F.2d at 1297).  Examples of public controversies include "the state of the oil industry," *Tavoulareas v. Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987), and "Russian oligarchs' involvement with the Russian government and its activities and relations around the world," *Fridman*, 229 A.3d at 507.  Gender equity in the workplace qualifies.  The judicially noticeable articles demonstrate widespread news coverage on this topic, *see* ECF No. 4-7 & 4-8, and such issues clearly impact the day-to-day lives of many individuals who are "not direct participants" in the ongoing debate, *Salem Media Grp.*, 301 A.3d at 648.  For example, one article titled "Why Some Women Call This Recession a 'Shecession'" discusses how women were disproportionately impacted by job loss. ECF No. 4-7 at 4.  Others cover the impact of the gender wage gap.  ECF No. 4-8 at 12, 24.

Dr. Mason does not convincingly contest this prong.  In her opposition, she claims that "gender equity issues" are not a public controversy but fails to explain why.  ECF No. 10-1, at

30-31.  Indeed, her own statements seem to contradict these assertions.  In the materials provided to Ms. McShane, Dr. Mason went on the record as saying that, under her leadership, IWPR was "active at the center of important conversations for gender equity and [had] position[ed] it[self] as the go-to think tank of the women's rights movement."  ECF No. 4-9, at 9.  The court disagrees with Dr. Mason's suggestion that "gender equity" and the "women's rights movement" are not "real dispute[s]" that "affect[] the general public . . . in an appreciable way."  *Waldbaum*, 627 F.2d at 1296.

   *Dr. Mason's role in the public controversy.*  A plaintiff voluntarily becomes a limited-purpose public figure when she "achieve[s] a special prominence in the debate" and "tr[ies] to influence the outcome or could . . . have an impact on its resolution."  *Moss*, 580 A.2d at 1031.  Greater access to media is an indicator of public figure status, as is regular and continuing public outreach.  *Id.* at 1029.

   Dr. Mason is a public figure in the controversy.  She gained significant public prominence when she assumed the role of President and Chief Executive Officer of IWPR, a nonprofit that is actively involved in increasing gender equality in the workplace.  ECF No. 1 ¶ 7.  Even before taking on this role, Dr. Mason had "more than twenty years of research and advocacy experience focused on women's economic security."  *Id.* ¶ 24.  And upon joining IWPR, she "substantially raised [the organization's] public profile," "participate[d] in public forums and networking events," and "spearhead[ed] two major conferences."  *Id.* ¶¶ 27, 31.  She even won an industry award and "was named one of the World's Greatest Leaders by *Fortune Magazine*."  *Id.* ¶ 27.  By virtue of her role, experience, and activities, Dr. Mason was a prominent figure promoting gender equality in the workplace.

*Waldbaum* provides a useful point of comparison.  There, the former Chief Executive Officer of a supermarket company was deemed a limited-purpose public figure in a defamation case concerning an article about his ouster from the company.  627 F.2d at 1290, 1300.  The court explained that the plaintiff had "thrust" himself into a topic of public debate—the supermarket industry generally—by hosting forum discussions, overseeing the company's marketing, and making public statements on the company's behalf.  *Id.* at 1300.  Based on this, the court determined that he was a limited-purpose public figure on the topics of the company's policies and its approach to the industry.  *Id.*

Dr. Mason is similarly situated to the plaintiff in *Waldbaum*.  She injected herself into the topic of gender equity in the workplace by conducting outreach on behalf of IWPR and raising her profile as a thought leader in the space.  ECF No. 1 ¶¶ 27-29, 31.  While Dr. Mason is correct that "[b]eing an executive within a prominent and influential company does not by itself make one a public figure," ECF No. 10-1, at 32 (quoting *Waldbaum*, 627 F.2d at 1299), she did more than merely run IWPR.  She "substantially raised IWPR's public profile by taking steps to participate in public forums and networking events," led two large conferences, received an industry award, and was the subject of other press coverage.  ECF No. 1 ¶¶ 27, 31.  The complaint (and the news articles, ECF Nos. 4-8 & 4-9) clearly establish that Dr. Mason took on a public role over and above that of a typical executive.

*Germaneness.*  The statements "must be 'germane to the plaintiff's participation in the controversy.'"  *See Jankovic II*, 822 F.3d at 589 (quoting *Waldbaum*, 627 F.2d at 1298).  "This [approach] ensures that publishers cannot use an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life."  *Id.*

The allegedly defamatory statements at issue here are germane to the controversy.  Many of Dr. Mason's qualms with the article relate to statements about her ability to lead IWPR and, in turn, the organization's ability to fulfill its goals to promote gender equity in the workplace.  *See* ECF No. 1 ¶ 122.  That is certainly germane to the broader controversy.  Dr. Mason argues that the statements "concern IWPR's internal affairs" and "d[o] not involve any gender equity issues, i.e., issues involving disparate treatment of men and women."  ECF No. 10-1, at 32.  That misunderstands the test.  "Statements, including those highlighting a plaintiff's 'talents, education, experience, and motives,' can be germane."  *Jankovic II*, 822 F.3d at 589 (quoting *Waldbaum*, 627 F.2d at 1298).  The allegedly defamatory statements relate to Dr. Mason's experience and ability to effectively advocate on issues of gender equality.  They are plainly germane.

### b.      Application of the actual malice standard

"As a limited-purpose public figure, [Dr. Mason] can prevail on [her] defamation claim only if [s]he 'proves that the statement[s] [were] made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'"  *Jankovic II*, 822 F.3d at 589 (quoting *Sullivan*, 376 U.S. at 279-80).  Defendants are reckless if they "in fact entertained *serious doubts* as to the truth of [the] publication."  *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).[5]

---

[5] A complaint must plead facts supporting actual malice with sufficient plausibility.  It is not enough for the complaint to flatly state that a defendant acted with reckless disregard for the truth.  Dr. Mason cites two cases for the contrary proposition that the court "must . . . assume" actual malice when it is alleged: *Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001), and *Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013). ECF No. 10-1, at 33. But *Weyrich* was decided before *Twombly* and *Iqbal*, and *Farah* relied on *Weyrich* without explaining the intervening effect of *Twombly* and *Iqbal*.  Therefore, "despite [the] 'seemingly broad pronouncement' [from *Weyrich* and *Farah*], courts still grant motions to dismiss based in part on the failure of a public figure to plausibly allege facts that support an inference of actual malice in a defamation case."  *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 143 (D.D.C. 2017).

Applying the actual malice standard resolves the remaining aspects of Dr. Mason's defamation claim, which concerns the article's statements about IWPR's turnover rate and the unstaffed SPSI research group. *See supra*, Part IV(B)(1)(b). Dr. Mason has not plausibly alleged that *TAP* or Ms. McShane made these statements with a reckless disregard for whether they were true.

Starting with the turnover rate, the article claims that IWPR's turnover rate was 80% in 2021 and 78% in 2022. ECF No. 4-5, at 5. Because the actual turnover rate, as alleged in the complaint, was closer to 40%, ECF No. 1 ¶ 70, the article's figures are false. Dr. Mason further alleges that she "told Ms. McShane on two separate occasions by e-mail that [her] calculations were incorrect and that IWPR's leadership could not verify Ms. McShane's calculations." *Id.* But the emails, which have been incorporated by reference into the complaint, do not directly tell Ms. McShane that her figures are false. The first email only discusses staffing issues generally and does not specifically address the turnover *rate*. *See* ECF No. 4-9, at 5 ("Although IWPR has seen some staff attrition and turnover through the reorganization process and COVID, [it] has continued to produce a significant volume of research[.]"). And while the second email does mention the turnover rate, it states only that "it is important to note the numbers/calculations you have regarding retention/attrition . . . have not been independently verified/confirmed." ECF No. 4-10, at 3. At no point in these emails does Dr. Mason expressly tell Ms. McShane that her calculations are wrong, false, or inaccurate. And even if she had, reporters "need not accept 'denials, however vehement [because] such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021) (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003)). In *Tah*, for example, the

D.C. Circuit was not persuaded by the plaintiffs' attempt to "draw an inference of actual malice from [the defendant]'s failure to credit their denials," because the "denials contain[ed] no 'evidence that could be readily verified' of the sort that would provide 'obvious reasons to doubt the veracity of [the defendant's] publication.'" *Id.* (quoting *Lohrenz*, 350 F.3d at 1285).

Additionally, the emails reveal that Ms. McShane subsequently provided her precise methodology for calculating the turnover rate. *See* ECF No. 4-10, at 2-3. She further noted that her methodology was "confirmed by three different academics who study nonprofit management at three different universities" and was informed by "more than two dozen interviews, more than 50 internal documents[,] and the staffing information available on [IWPR's] website and in other publicly available places online." *Id.* These email exchanges contradict Dr. Mason's assertion that Ms. McShane had a reckless disregard for the truth of her turnover figures, rendering her allegations implausible. *See Kaempe*, 367 F.3d at 963 (explaining that the court need not "accept as true the complaint's factual allegations insofar as they contradict . . . matters subject to judicial notice").

Turning to the allegation regarding understaffing, the article stated that IWPR's SPSI research group was "unstaffed" when, according to Dr. Mason, two individuals had been hired into the group by the time the article was published. ECF No. 4-5, at 9; ECF No. 1 ¶ 91. As to actual malice, Dr. Mason alleges that "information [about the staffers' hiring] was provided to Ms. McShane prior to publication." ECF No. 1 ¶ 91. The complaint, however, does not provide any additional detail as to what was communicated to Ms. McShane. It does not specify who supplied the information, when it happened (other than, presumably, some time before the date the article was published), or what was said. If Dr. Mason is referring to the email exchanges incorporated by reference into the complaint, they are also unilluminating. Unlike the turnover

issue, which is at least discussed in the emails, there is no mention of SPSI or the two new researchers who were hired (Afet Dundar and Jennifer Turner, *see* ECF No. 1 ¶ 91).  At most, the emails say that IWPR "will be announcing several significant hires in the coming weeks."  ECF No. 4-9, at 6.  That is hardly enough information to provide Ms. McShane with the requisite knowledge to know that her SPSI-related reporting was false.[6]

For these reasons, the court concludes that Dr. Mason has not alleged actual malice with sufficient plausibility to raise her claims "above the speculative level."  *Twombly*, 550 U.S. at 555.  Therefore, the court will dismiss Dr. Mason's defamation claim.

### C.      Tortious Interference with Business Relations (Count II)

Dr. Mason also alleges that Defendants tortiously interfered with her business relationship with IWPR.  ECF No. 1 ¶¶ 127-35.  But her tortious interference claim rises and falls with her defamation claim because "[a] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."  *Farah*, 736 F.3d at 540 (quoting *Moldea II*, 22 F.3d at 319-20); *see, e.g.*, *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 93-94 (D.D.C. 2019) (dismissing a tortious interference claim after the plaintiff failed to sufficiently allege a defamation claim based on the same conduct); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 267-68 (D.D.C. 2016) (same, but at summary judgment), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).  Therefore, the court will dismiss this claim.

---

[6] Dr. Mason further claims that actual malice can be shown by Defendants' "bad faith and ill will," arguing that Dr. Hartmann and Ms. McShane colluded to publish the article as a "hit piece."  ECF No. 10-1, at 35.  But "preconceived notions" or "suspicion[s]" usually do "little to show actual malice."  *Tah*, 991 F.3d at 241 (alteration in original) (quoting *Jankovic II*, 822 F.3d at 597).  And "'concoct[ing] a pre-conceived storyline' by itself is 'not antithetical to the truthful presentation of facts.'"  *Id.* (alteration in original) (quoting *Jankovic II*, 822 F.3d at 597).  Dr. Hartmann's purportedly driving role in the article's production is largely speculative.  And even if it were true, that does not create a defamation claim where there otherwise is none.

### V.      Conclusion

For the foregoing reasons, the court will grant in part Defendants' Motion for Judicial Notice, ECF No. 5, and grant in full Defendants' Motion to Dismiss, ECF No. 4.   A contemporaneous order will issue.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date:   September 30, 2024